In re AMERICAN CENTRAL
AIRLINES, INC., Debtor,

AMERICAN CENTRAL AIRLINES,
INC., Plaintiff,

v.

DEPARTMENT OF TRANSPORTATION,
an Executive Department of the United
States of America, Defendant.

Bankruptcy No. 85–00469D.
Adv. No. 85–0256D.

United States Bankruptcy Court,
N.D. Iowa.

April 28, 1986.

Eric Lam, Cedar Rapids, Iowa, for plaintiff.

Scott Harbottle, Dept. of Justice, Washington, D.C., for defendant.

## ORDER

JOHN J. CONNELLY, Bankruptcy Judge.

This matter came before the undersigned Bankruptcy Judge, sitting by special designation in the Northern District of Iowa, upon the motion of the Department of Transportation ("DOT") for summary judgment and plaintiff's motion for citation of contempt. Eric Lam, attorney, appeared on behalf of plaintiff/debtor. Scott A. Harbottle, attorney, appeared on behalf of DOT.

Prior to filing its petition under Chapter 11 of the Bankruptcy Code, debtor, an air carrier, was awarded the right by the Civil Aeronautics Board ("CAB")[1] to participate in a federal subsidy program pursuant to 49 U.S.C. § 1389. The purpose of the subsidy program is to preserve and/or provide essential air services to small communities or low density areas which meet certain criteria set forth by Congress in § 419(a)(1) of the Act. The determination specifies to which air hub (or hubs) the designated carrier is to provide service, the minimum number of seats to be provided in each direction, the minimum number of daily round trips to be provided, the maximum number of intermediate stops allowable, and the minimum standards to be maintained by the aircraft used.

If a contracting carrier wishes to terminate, suspend, or reduce air service below the "essential air service level" to any eligible community, it is required to give proper notice to DOT, the appropriate state agency, and the community affected. Proper notice is 90 days for carriers which are certified or subsidized and 30 days for carriers which are not certified or subsidized. In addition, a contracted carrier is required to maintain its service beyond the initial notice period until a replacement carrier can be found to provide essential air service to the community on a continuing basis.

Under this program, debtor provided essential air service to Beloit and Janesville, Wisconsin, beginning on August 17, 1981 and continued serving these communities until it ceased all operations on July 24, 1985. Debtor provided essential air services to Manistee and Ludington, Michigan, beginning on June 1, 1982 until December 8, 1984 when the Federal Aviation Administration temporarily stopped all of debtor's flights. Debtor never resumed services to these two communities. Debtor provided essential air services in Iowa to Mason City from December 14, 1982 through July 24, 1985 and Clinton and Ottuma from April 26, 1982 through July 24, 1985.

Once American Central Airlines, Inc. ("ACA") was selected by CAB/DOT to provide essential air services, ACA became obligated to meet its service schedule which requires, absent severe weather, airport closings, or other problems that might impede an air carrier's ability to fulfill its obligation, to provide regular and reliable service to these designated communities. In exchange for providing regular and reliable service, debtor received monthly subsidy payments based on a payout formula which sets forth the specific terms for compensating carriers for the essential air services they provide.

Typically, the subsidy rate is established for each community through a rate conference between the agency and the selected air carrier. CAB would enter an order establishing a set subsidy rate based upon a specified formula for each year the air carrier provided essential air service to each designated city. Thus, debtor's monthly subsidy payments might vary slightly to reflect the exact number of ser-

1. CAB's functions were subsequently transferred to DOT, defendant herein.

vice days and actual number of flights provided in that particular month. From 1979 through the spring of 1983, an additional fuel cost adjustment provision was provided in many subsidy rate formulas under which debtor operated, due to the erratic behavior of fuel prices experienced during that period. Therefore, with the additional fuel subsidy program in effect, debtor's subsidy payment was subject to further adjustment based upon the cost of fuel used by debtor.

For each essential air service flight taken, debtor was required to properly log the date of the trip, time of the trip, miles covered, and destination serviced, as well as other documentation which was then filed on a monthly basis with DOT so that a computation of the monthly subsidy payment could be made based upon the set formula thereafter.

An air carrier participating under the Essential Air Service Program ("EAS") was further required to retain all books, records, and other source and summary documentation to support subsidy claims to CAB and to prepare and maintain such documentation in a manner as to readily permit the audit and examination thereof by representatives of CAB. In mid 1984, CAB conducted an audit which indicated that debtor was overpaid. The original audit indicated an overpayment of $236,249.00 and in November, 1984 CAB began to withhold monthly subsidy payments until the overpayment was recovered. The overpayments claimed under the audit were based upon debtor's inability to document certain flights for which it had claimed subsidies and its inability to document certain fuel purchases for periods when fuel cost adjustments were in effect. Following additional review of the audit results, the amount of overpayment was reduced to $218,000.00. Recovery of this amount was effected by withholding subsidy payments from November 1, 1984 through May 11, 1985.

On March 8, 1985 ACA, debtor herein, filed a petition under Chapter 11 of the Bankruptcy Code. On July 24, 1985 debtor filed this action seeking $149,784.00 alleging that:

1) This amount represents subsidy payments earned under the Central Air Service Program accruing after the filing of the Chapter 11 petition;

2) These funds are property of the estate under § 541 and § 363; and

3) The withholding of these funds is not a permissible setoff under § 553 and therefore must be turned over under § 542 of the Bankruptcy Code.[2]

Debtor contends that what DOT is attempting to do is offset the overpayments that it claimed were paid back in 1982, 1983, and/or 1984 against the subsidy amounts earned by debtor after the filing of the Chapter 11 petition. DOT takes the position that the withholding of post-petition subsidy payments earned by debtor constitutes a "recoupment" and not a setoff and therefore is not subject to the limitations of § 553 or in violation of the automatic stay. 11 U.S.C. § 553 provides in pertinent part:

(a) Except as otherwise provided in this section and in § 362 and § 363 of this Title, this Title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case ...

■■■ Setoff under § 553 is allowed in bankruptcy only under very narrow circumstances. Section 553 allows setoff of a pre-petition *mutual debt* and claim between debtor's estate and the creditor, with some additional restrictions. It does not, however, create any new right of setoff where none existed under non-bankruptcy

---

**2.** There is a dispute between debtor and DOT regarding the correct amount of subsidy payments earned by debtor post-petition. Debtor claims the amount of $149,784.00 while DOT claims that the amount which debtor was entitled to claim for the period of March 9, 1985 through May 11, 1985 is $144,519.00.

law. Under the legal and equitable principles of setoff recognized by § 553(a), the mutual debt and claim contemplated are generally those arising from different transactions. Any setoff is usually asserted for the purpose of reducing or extinguishing creditor's claim against debtor, but it has been stated that defendant may be entitled to a judgment in his favor for any excess over and above creditor's claim against debtor. (See 4 Collier on Bankruptcy, § 553.03 (15th Edition, 1984)).

A claimant who properly invokes setoff under § 553 in effect elevates an unsecured claim to a secured position to the extent that debtor has a mutual, pre-petition claim against creditor thereby receiving a permissible preference over other creditors. (See 11 U.S.C. § 506(a)).

■ The actual setoff may be made either prior to or after the filing of the bankruptcy petition. However, setoff under § 553 after the bankruptcy case has begun requires obtaining relief from the automatic stay under § 362(a)(7) of the Code. The requirement of mutuality is of particular significance after the filing of a petition in bankruptcy. Because of the distinction between debtor and debtor-in-possession under the Bankruptcy Code, the majority of courts have concluded that the requisite element of mutuality of parties is lacking whenever a creditor attempts to offset a pre-petition debt against a post-petition claim.

■ The doctrine of recoupment differs from setoff mainly in that the claim must grow out of the identical transaction that furnishes plaintiff's cause of action and, being in the nature of a claim of right to reduce the amount demanded, can be had only to an extent sufficient to satisfy plaintiff's claim. In other words, recoupment goes to the justice of plaintiff's claim and no affirmative judgment for any excess over the claim of plaintiff can be awarded thereon. (See 20 Am.Jur.2d, Counterclaim, Recoupment & Setoff, § 11 and § 12).

Recoupment originated as an equitable rule of joinder. It allowed adjudication in one suit of two claims that otherwise had to be brought separately under the common law forms of action. Under recoupment, defendant could meet a plaintiff's claim with the countervailing claim that arose "out of the same transaction." (See J. Moore, 3 Moores Federal Practice, Page 13.02, at 1313 N. 1 (2nd Ed.1985); 20 Am. Jur.2d, Counterclaim, Recoupment & Setoff, § 16–§ 18 (1965).

■ As further explained in 4 Collier on Bankruptcy, ¶ 553.03 (15th Ed.1984), recoupment is not subject to the limitations on setoff in § 553 of the Bankruptcy Code; recoupment ... is the setting up of a demand arising from the same transaction as plaintiff's claim or cause of action strictly for the purpose of abatement or reduction of such claim.... There is no element of preference here or of an independent offset but merely an arrival at a just and proper liability on the main issue.

While the doctrine of setoff goes to mutual debts existing between debtor and creditor, recoupment deals with the amount of damages plaintiff is entitled to in a suit arising out of the same transaction. Since the doctrine of recoupment deals only with the amount of damages plaintiff is entitled to receive, the distinction between pre-petition and post-petition events does not apply. In bankruptcy, both the doctrine of setoff and recoupment have been adopted, setoff by statute, see 11 U.S.C. § 553, and recoupment by decision, the most recent being *In re B & L Oil Company*, 782 F.2d 155 (10th Cir., 1986).

Debtor contends that DOT is attempting to set off their post-petition obligation to pay over to debtor-in-possession post-petition subsidy payments against the pre-petition obligation of debtor to turnover subsidy payments received pre-petition in excess of the amount it was entitled to. In support of this position, debtor contends that each EAS trip, be it pre or post-petition, constituted a single transaction separate and distinct from any other EAS trip. It is

only after any EAS trip is taken that debtor is entitled to receive a subsidy payment.

■ In further support of this argument, debtor points to the fact that for each EAS trip taken, it was required to properly log the date of the trip, time of the trip, miles covered, and destination of the flight, as well as fuel used when the fuel subsidy program was in effect. Whether or not each EAS flight constituted a separate and distinct transaction for the purposes of § 553 is a question of law to be determined by the court.

■ The bookkeeping requirements that EAS carriers such as debtor was required to meet in order to claim subsidy payments did not define the air carrier's service responsibilities or the nature of the carrier's service obligation. The bookkeeping requirements were merely a way to substantiate payments as previously set out by the subsidy rate which was established for each community and contained within an "order" issued by DOT upon picking an air carrier to provide EAS service.

In choosing debtor to be the essential air carrier for the communities listed above, debtor became obligated to provide essential air service to those communities on an ongoing and regular basis. Debtor was required to maintain a weekly service schedule providing air service to designated communities, subject only to severe weather, airport closings, or other problems that impeded debtor's ability to service those areas. Debtor was required to continue fulfilling all of its service obligations even after it gave notice to terminate, suspend, or reduce the level of air service until a replacement air carrier could be found.

In exchange for providing air service to these communities, debtor became eligible to receive subsidy payments under the payment formula set forth in the order issued by DOT. The subsidy rates, as set by DOT at the beginning of the relationship between the parties, were continually subject to a final field audit by DOT under then § 407(a) of the Federal Aviation Act and, in fact, at various times prior to the filing of the above Chapter 11 petition, debtor was required to reimburse DOT for overpayments received after such a field audit was conducted and debtor was unable to provide the necessary documents to substantiate the flights for which a subsidy was paid or documenting fuel purchases for which fuel cost adjustments were given.

Based upon the evidence and testimony before it, the court is satisfied that claims between DOT and American Central Airlines, Inc. arise out of the same transaction. Having so determined, the court concludes that the issue here is not one of right of setoff but rather one of right of recoupment. Courts in other jurisdictions which have allowed recoupment typically involve a single contract which provides for advance payments based on estimates of what ultimately would be owed, subject to later correction, and therefore the court's analysis revolved around the treatment of executory contracts in bankruptcy.

When an executory contract is involved, courts have applied the well-established rule that a debtor who assumes an executory contract must assume both the benefits and the burdens of that contract; he cannot pick and choose among the provisions therein. Although the issue of whether or not the relationship between the parties constitutes an executory contract is not before the court; the court thinks it significant that debtor did not stop providing essential air services at the time it filed its bankruptcy petition but continued to perform all of its obligations and continues to claim eligibility to receive subsidy payments from DOT.

In *B & L Oil Company,* supra, debtor executed an oil division order in favor of plaintiff/appellant, Ashland Petroleum Company ("Ashland"). Pursuant to this order, Ashland obtained the right to purchase unspecified amounts of crude that B & L Oil Company produces. On several occasions prior to the filing of the Chapter 11 petition, Ashland overpaid B & L Oil Company for oil produced and delivered. After B & L Oil Company's bankruptcy

petition, Ashland withheld payments owed to B & L for subsequent oil deliveries in order to recover the amount of its pre-petition overpayment.

Both the bankruptcy court and the district court held that recoupment was improper because the debts did not arise from the same transaction. The United States Court of Appeals for the Tenth Circuit reversed both the bankruptcy court and district court finding that the recoupment doctrine properly applied in this case since it was analogous to other bankruptcy cases in which recoupment has been allowed. This court is in agreement with the decision reached by the Tenth Circuit Court of Appeals and adopts the reasoning contained therein and therefore finds that application of the doctrine of recoupment is warranted in this case.

■ An additional theory put forth by debtor for turnover of the subsidy payment is based upon the ground that it constitutes property of the estate as defined in 11 U.S.C. § 541. Section 541 provides in pertinent part:

(a) The commencement of this case under § 301, § 302, or § 303 of this Title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(7) Any interest in the property that the estate acquires after the commencement of the case.

The court, having determined that debtor's interest in the post-petition subsidy payments is subject to the right of recoupment by DOT to the extent of overpayments previously received, finds that debtor is not entitled to turnover of this property under 11 U.S.C. § 541. At the commencement of this Chapter 11 proceeding, the overpayments received by debtor became property of the estate subject, however, to the superior claim of DOT since debtor was not entitled to receive or retain these overpayments. Likewise, debtor's right to receive post-petition subsidy payments were subject to DOT's right to recoup the amounts overpaid pre-petition; therefore, the interest that the bankruptcy estate acquired in the post-petition subsidy payments is subject to DOT's right to recoup. Furthermore, to allow debtor to retain pre-petition subsidy overpayments as well as all post-petition subsidy payments would unjustly enrich debtor's estate and provide a windfall to other creditors. For the same reasons, debtor's motion to hold DOT in contempt for violation of the automatic stay pursuant to 11 U.S.C. § 362 by withholding subsidy payments is moot in light of the foregoing decision of this court.

The court having concluded that the application of the doctrine of recoupment properly applies, the court hereby ORDERS and directs the parties to provide an accounting to this court as to pre-petition overpayments received by debtor and post-petition subsidy payments earned by debtor during the time debtor remained eligible to receive said payments.

IT IS FURTHER ORDERED:

1) The motion of the Department of Transportation for summary judgment be and the same is hereby granted and the Department of Transportation may recoup subsidy overpayments paid over to American Central Airlines, Inc. prior to the filing of the above Chapter 11 case from subsidy payments earned by American Central Airlines, Inc. after May 8, 1984 only to the extent of post-petition subsidy payments earned by American Central Airlines, Inc.;

2) Debtor's request for turnover of the post-petition subsidy payments in the amount of $149,784 be and the same is hereby denied in all respects;

3) Debtor's motion for contempt be and the same is hereby denied.

The court will hold open the issue of debtor's further entitlement to post-petition subsidy payments pending the outcome of the accounting to be filed with this court.