In re DARTCO, INC., d/b/a Stockmen's Truck Stop, Debtor.

Molly T. SHIELDS, Trustee of the Estate of Dartco, Inc., d/b/a Stockmen's Truck Stop, Plaintiff,

v.

Terry DUGGAN, Barbara Rice, Mark R. Leitner, Successor Conservator for Debra J. Rice, and Stockmen's East, Inc., Defendants.

Bankruptcy No. 3–91–416.
Adv. No. 3–93–238.

United States Bankruptcy Court,
D. Minnesota,
Third Division.

July 1, 1996.

Timothy J. Ewald, Molly T. Shields, Minneapolis, MN, for Trustee.

Eric W. Forsberg, Minneapolis, MN, for Defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT ON COUNT IX OF PLAINTIFF'S COMPLAINT

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding came on before the Court for trial on Count IX of the Plaintiff's amended complaint, which sounds exclusively against Defendant Mark R. Leitner, Successor Conservator for Debra J. Rice. The Plaintiff appeared personally and by Timothy J. Ewald, her attorney. Defendant Leitner appeared by Eric W. Forsberg, his attorney. Upon the evidence adduced at trial and the memoranda and argument submitted by counsel, the Court makes the following pursuant to FED.R.BANKR.P. 7054.

### FINDINGS OF FACT

The Debtor is a Minnesota corporation. At all relevant times, it operated the Stockmen's Truck Stop in South St. Paul, Minnesota. The truck stop's business consisted of a retail dealership in petroleum products and an associated restaurant and store. On January 23, 1991, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. It obtained confirmation of a plan of reorganization on July 17, 1992. When the Debtor failed to substantially consummate its plan in a timely fashion, the United States Trustee moved for conversion or dismissal of the case. After finding that one of the Debtor's principals had converted certain post-conversion assets of the Debtor to his own use, the Court converted the case to one under Chapter 7 on January 13, 1993.

The Plaintiff is the Trustee of the Debtor's estate under Chapter 7. At all relevant times, Defendants Terry Duggan and Barbara Rice were the Debtor's principals; Duggan was the Debtor's President and held 96 percent of its outstanding shares, and Barbara Rice managed its truck stop operation and held 4 percent of its outstanding shares.

Debra J. Rice is the daughter of Barbara Rice. In 1984, she suffered grievous injuries that left her incapacitated, unable to manage her estate or to fully care for herself. By an order entered on September 24, 1984, the Probate Division of the Minnesota State District Court for the Second Judicial District, Hennepin County, appointed Barbara Rice as conservator for the person and the estate of Debra Rice.

In 1988, a medical malpractice action brought in Debra Rice's name was concluded by a structured settlement. Under its terms, Debra Rice received an immediate payment of approximately $100,000.00, and became the beneficiary-payee of an annuity providing her with a substantial regular income. As conservator, Barbara Rice began receiving and administering these payments. The payments and their proceeds were essentially the only assets subject to the conservatorship.

After it filed under Chapter 11, the Debtor continued its business as a retail truck stop, selling diesel fuel and other goods and services to the public. A number of its trade vendors, including petroleum wholesalers, continued to supply it "on invoice"—*i.e.*, with grants of very short-term credit.[1] In the late spring of 1992, however, the Debtor began to experience severe cash-flow difficul-

---

1. As Barbara Rice testified, the petroleum vendors gave the Debtor credit to the extent of allowing two deliveries of product before requiring payment for the first such upon the delivery of a third.

ties.[2] After several of its checks to trade vendors were dishonored for insufficient funds on deposit, the vendors began demanding payment in full upon delivery, in cash or cashier's check. These terms posed a serious issue for the maintenance of diesel fuel inventory; a filling of the Debtor's storage tanks to capacity only lasted a day to two days in the ordinary course. When current cash on deposit was insufficient to pay for a fill, then, the business faced a real problem.

To cover these cash insufficiencies, Barbara Rice began drawing on the funds she held as conservator for the benefit of her daughter. She made arrangements with the Debtor's petroleum suppliers to order diesel fuel inventory by telephone. After the supplier's driver loaded his tanker, the supplier advised Barbara Rice of the gallonage and the price of the shipment. She then went to Battle Creek Bank, where she maintained accounts for the conservatorship, and negotiated a check off one of the accounts to purchase a cashier's check payable to the supplier. She then returned to the truck stop, delivered the money order to the driver, and took delivery of the load of fuel.

Afterwards, Barbara Rice would issue a check or checks off the Debtor's general business account, payable to Debra Rice, and would deposit them into the conservatorship checking account. In doing so, she intended to "replace the money in the conservatorship account as quickly as [she] could." The vagaries of the Debtor's cash position often required her to go through an involved series of transactions, both direct and indirect. She often made the repayment by writing and depositing two checks, each in the amount of one-half of the original withdrawal from the conservatorship account.[3] From time to time she deposited "repayment checks" from the

Debtor in her personal account to ensure that they were honored, before writing a check off that account for deposit into the conservatorship account. The monies that funded the "repayment" checks were derived from the Debtor's sales of petroleum products and from its other ongoing operations.

Between May 11 and June 29, 1992, the Debtor issued twenty-one checks to Debra Rice that were honored after their direct or indirect deposit into the conservatorship account.[4] The face amount of these checks was $87,550.00. The Debtor's bank honored all of these checks.

Debra Rice remained unaware of these transactions, and of several previous ones with the Debtor that involved conservatorship funds, until sometime in the mid- or late summer of 1992. At that time, Barbara Rice told her that she had no money left with which to make a purchase that she wished. Debra then consulted counsel. He made inquiry and then obtained an order from the Hennepin County District Court to suspend Barbara's status as conservator. On September 28, 1992, that court entered an order accepting Barbara Rice's resignation as conservator, and appointing Defendant Leitner as successor conservator. The true nature and effect of Barbara Rice's transactions with the Debtor with conservatorship funds were not disclosed to the Hennepin County District Court until shortly before she filed her final account in September 1992.

During the pendency of its case under Chapter 11, the Debtor never made a motion to this Court to obtain authority to incur short-term credit from Debra Rice or from Barbara Rice, as her conservator. The Debtor never disclosed the transactions with

---

2. The difficulties were illustrated by the evidence at trial. Between May 1 and June 30, 1992, 27 checks drawn by the Debtor on its business checking account at Norwest Bank Minnesota, N.A. were returned for insufficient funds. This happened even though over $450,000.00 in gross revenues passed through the account during the same months. Both Duggan and Barbara Rice testified at trial, but neither of them volunteered an explanation as to why the Debtor operated at such a loss during the period.

3. Barbara Rice admitted that she did this to minimize the chance that a check from the Debtor's business account would "bounce off the conservatorship account."

4. Copies of these checks were received into evidence as Plaintiff's Exhibits 5–24 and 26. The Plaintiff also proffered a twenty-second check as Exhibit 25. Defendant Leitner objected to its admission, on the ground that the Plaintiff had never produced it in discovery or otherwise put that transfer into issue. The Court sustained the objection.

the conservatorship funds to the Bankruptcy Court in any way. Nor did it ever disclose these transactions in any of its periodic financial reports to the office of the United States Trustee.[5]

On March 3, 1993, prior counsel for Defendant Leitner filed a proof of claim against the Chapter 7 estate. In attachments, he evidenced the basis of the claim as follows:

1. Debts of a total of $148,257.53 in principal and interest, owing under two promissory notes by the Debtor in favor of Barbara Rice, as conservator for Debra Rice, dated November 2, 1988 and December 18, 1990; and

2. an "[u]nsecured priority claim" in the amount of $35,636.27, "represent[ing] the differences between the cash advances made to Debtor over the amount returned by the Debtor after the filing of the Chapter 11 petition."

Neither the Plaintiff nor any other party in interest has objected to this claim.

## CONCLUSIONS OF LAW

### I. Jurisdiction and Authority

■ This is a core proceeding in bankruptcy.[6] 28 U.S.C. §§ 157(b)(2)(A), (b)(2)(C), and (b)(2)(O ).[7] As a result, the undersigned has full authority to render decision and to order a final judgment. 28 U.S.C. § 157(b)(1).[8] Defendant Leitner has no right to a jury trial and the parties' dispute was properly tried to the Court.[9]

---

5. There is no direct evidence in the trial record that goes to this finding. However, a staff attorney from the office of the U.S. Trustee was actively involved early in the case, beginning with a motion for conversion or dismissal brought by the Unsecured Creditors Committee. At no time did he ever give any indication of being aware of these transactions. Since the transactions were so out of the ordinary course for a reorganizing debtor, the lack of any mention or expression of concern on the part of the U.S. Trustee fully supports a finding that the Debtor never disclosed the transactions to that office.

6. In his amended answer, Defendant Leitner denied that this was a core proceeding. The theory for this position was somewhat obscure, but it is obviously wrong. The Plaintiff complains of acts that all took place when the Debtor and the estate were fully under the jurisdiction of this Court. If those acts were not authorized by law, this is the obvious forum to redress their effects and to vindicate its own jurisdiction. In the phrase that the Eighth Circuit has used to describe a core proceeding, this matter certainly "strikes at the heart of the debtor-creditor relationship," as that relationship works its way through bankruptcy. In re Tranel, 940 F.2d 1168, 1174–1175 (8th Cir.1991).

7. These provisions read:
Core proceedings include, but are not limited to—
(A) matters concerning the administration of the estate;

. . . . .

(C) counterclaims by the estate against persons filing claims against the estate;

. . . . .

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

The Eighth Circuit has cautioned against an expansive reading of the "catchall" provisions of 28 U.S.C. §§ 157(b)(2)(A) and (O ). In re Cassidy Land and Cattle Co, Inc., 836 F.2d 1130, 1132 (8th Cir.1988). However, it is scarcely an expansive construction to read these provisions to encompass an action to recover assets transferred out of a bankruptcy estate, allegedly in violation of law and fiduciary duty. In any event, Defendant Leitner has filed a claim against the estate based on related post-petition transactions, and this adversary proceeding is certainly in the nature of a counterclaim to that.

8. This provision reads, in pertinent part:

Bankruptcy judges may hear and determine ... all core proceedings arising under [the Bankruptcy Code], or arising in a case under [the Bankruptcy Code], referred under [28 U.S.C. § 157(a)], and may enter appropriate orders and judgments ...

The District Court for this District has made the referral contemplated by 27 U.S.C. § 157(a). See Loc.R.Bankr.P. (D.Minn.) 201.

9. Defendant Leitner demanded a jury trial in his original and amended answers. However, because he had filed a proof of claim against the Chapter 7 estate, he is deemed to have waived any right to a jury trial that he may have had under the Seventh Amendment. Langenkamp v. Culp, 498 U.S. 42, 44–45, 111 S.Ct. 330, 331–32, 112 L.Ed.2d 343 (1990), reh'g denied, 498 U.S. 1043, 111 S.Ct. 721, 112 L.Ed.2d 709 (1991).

## II. Plaintiff's Cause of Action

Through this adversary proceeding, the Plaintiff seeks to avoid the transfers of funds that took place when the Debtor's checks to Debra Rice were honored in May and June, 1992, and to obtain a money judgment for their face amount. To do so, she invokes 11 U.S.C. § 549(a).[10] With the avoided transfer then preserved by operation of 11 U.S.C. § 551[11] she seeks a judgment pursuant to 11 U.S.C. § 550(a)(1)[12] that would authorize her to recover an amount of money equivalent to the avoided transfers.

In a substantive sense, the elements of § 549(a) are the most straightforward of any of the trustee's avoiding powers under Chapter 5 of the Bankruptcy Code. To prevail, the trustee must demonstrate that,

1. after the commencement of the bankruptcy case in question,
2. property of the estate
3. was transferred, and
4. the transfer was not authorized by the Bankruptcy Court or by a provision of the Bankruptcy Code.

*In re Russell*, 927 F.2d 413, 417 (8th Cir. 1991); *In re Calstar, Inc.*, 159 B.R. 247, 252 (Bankr.D.Minn.1993); *In re Waterfront Cos., Inc.*, 56 B.R. 31, 33 (Bankr.D.Minn.1985).

## III. Issues Presented at Trial

The first element, of course, is beyond dispute; the subject transactions all took place while the Debtor was in Chapter 11.

**10.** Subject to two exceptions that are not applicable on the facts of this matter, this statute provides that:

... the trustee may avoid a transfer of property of the estate—
(1) that occurs after the commencement of the case; and ...

[(2)](B) that is not authorized under [the Bankruptcy Code] or by the court.

**11.** In pertinent part, this statute provides:

Any transfer avoided under.... [11 U.S.C. § ]549, ... is preserved for the benefit of the estate but only with respect to property of the estate.

**12.** Subject to exceptions and limitations not applicable here, this statute provides:

In a limited sense, at least, Defendant Leitner acknowledges the third element, by admitting that the honoring of a total of $87,-550.00 in checks made payable to Debra Rice put the subject funds out of the Debtor's control as each check was paid.[13] His defense, however, frames six different issues, most of which go to elements of § 549(a) other than the first.

### A. Diminution of Estate

Defendant Leitner's first line of defense is that, considering the sequence of transactions in the aggregate, "the estate of the Debtor was not damaged or diminished ..." As he would have it, "the amount [of funds] going to and from the conservatorship to the Debtor [was] essentially even," the only variance being attributable to the cashier's-check charges that Barbara Rice assessed against the Debtor. Thus, he posits, there was really no "transfer" within the meaning of § 549(a).

From the limited perspective of accounting, looking at the end-result in utter isolation, this point has a bit of weight. However, the argument misses the function of § 549(a): to protect the distribution priorities of the Bankruptcy Code and to promote the integrity of estate administration, by subjecting unauthorized transactions to avoidance so the assets in question are restored to the estate. The argument that the estate really has not been harmed in a fiscal sense appeals in a rather superficial way—but only

... to the extent that a transfer is avoided under [the Bankruptcy Code] ... the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
(2) any immediate or mediate transferee of such initial transferee.

**13.** He would have been hard-pressed to deny this. Applying various provisions of Article 3 of the Uniform Commercial Code in the context of an avoidance action brought by a trustee in bankruptcy, the Supreme Court has held that the honoring of a debtor-maker's check by its drawee-bank constitutes a "transfer" within the definitional provisions of the Bankruptcy Code. *Barnhill v. Johnson*, 503 U.S. 393, 404, 112 S.Ct. 1386, 1390–1391, 118 L.Ed.2d 39 (1992).

if one ignores the fact that the conservatorship was not, and is not, the only post-petition creditor of the Debtor. The Debtor had a fiduciary obligation to preserve its assets for ratable distribution among similarly-situated claimants. Other post-petition creditors had claims against the same funds on deposit in the Debtor's account. Many of those claims survived unsatisfied into the Chapter 7 case. The mere fact that the scales were largely righted between the Debtor and the conservatorship account does not mean that the estate was not reduced in a cognizable way, or that there was not a transfer of property cognizable under § 549(a).

### B. Intent to Make a Transfer

■ Defendant Leitner's second line of defense similarly goes to the "transfer" element. He points out that Barbara Rice "intended" to replenish the conservatorship account with funds out of the Debtor's operating account almost contemporaneously with the advances from the conservatorship's funds. Thus, he maintains, there was not really a "transfer" of the property of the bankruptcy estate cognizable under § 549(a), even though funds went around the circle of bank accounts. As he would have it, § 549(a) requires a trustee to prove that the transferor and/or the transferee actually intended to effect a "permanent" transfer of property before the remedy of avoidance will lie.

This argument misses the mark for at least two reasons. First, the text of § 549(a) makes no reference to the actors in any scenario under its scope, whether they be the bankruptcy estate and its chargeable fiduciary, as active or passive transferor, or the recipient of the funds, as transferee. The question of these parties' intent, then, is irrelevant under the plain language. Second, under the definition of 11 U.S.C. § 101(50),[14]

a "transfer" is identified by its simple functional aspect—a *de facto* passage of the control of the subject asset—and not by any intent to effect that passage.

Thus, under the text of the governing statutes, what Barbara Rice intended has no bearing on whether an avoidable transfer of estate property transpired. The text, being that simple, sets up elements that are that simple—*i.e.*, wholly uncharacterized by intent. There was a "transfer"; the Plaintiff has proved up the third element of § 549(a).

### C. Constructive Trust

■ Defendant Leitner' third argument goes to "the most basic requirement of ... § 549(a)," *In re Newman*, 875 F.2d 668, 670 (8th Cir.1989); he denies that the funds extracted from the Debtor were property of the bankruptcy estate in the first instance. He relies on the signal propositions that 11 U.S.C. § 541(a)[15] operates to vest the estate with no more right, title and interest in property than that held or taken in the first instance by the debtor, *In re Schauer*, 835 F.2d 1222, 1225 (8th Cir.1987), and that state law governs the determination of property rights in bankruptcy cases, *Butner v. U.S.*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979), and *Saline State Bank v. Mahloch*, 834 F.2d 690, 692 (8th Cir.1987). Noting that the subject transfers to the conservatorship account were always preceded by transfers in like or similar amounts from the conservatorship account to the Debtor, Defendant Leitner maintains that in the interim the Debtor held the funds in constructive trust for Debra Rice.

Under this theory, the Debtor never took more than a bare *de facto* control of these funds when it accepted advances from the conservatorship account to meet its immediate cash needs, and was only restoring that control to the conservatorship when it paid

---

**14.** The enumeration here is that on the statute books when this case was commenced in early 1991, before the enactment of the Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, 108 Stat. 4106. The 1994 legislation added a number of new provisions to § 101, which had the effect of renumbering the definition of "transfer" to § 101(54).

**15.** This statute provides that the bankruptcy estate is comprised of, *inter alia*, "all legal or equitable interests of the debtor in property as of the commencement of the [bankruptcy] case," § 541(a)(1), as well as "[a]ny interest in property that the estate acquires after the commencement of the case," § 541(a)(7).

them back; thus, the conservatorship account did not take property of the estate by receiving the Debtor's checks for deposit.

The emotional appeal of this argument is obvious, and its attractiveness goes beyond that; Debra Rice certainly does not lack a claim for justice. Throughout the whole sequence of events in question, she was the passive, unknowing, and innocent victim. of her mother's rather frantic manipulation of two different funds, both legally deemed to be held in trust. At this point, however, the question is whether, as a matter of "equity," a third trust should be imposed onto the subject of that manipulation, to the advantage of Debra Rice, as the beneficiary of one of the pre-existing trusts, and to the disadvantage of the Debtor's creditors, as the beneficiaries of the other.

Under Minnesota law,

> [a] constructive trust is a remedial device by which the holder of legal title is held to be a trustee for the benefit of another who in good conscience is entitled to the beneficial interest. Such a trust is adjudged for the purpose of working right and justice, regardless of whether the parties intended to create such a relation.

*Wilcox v. Nelson*, 227 Minn. 545, 35 N.W.2d 741, 744 (1949) (citation omitted). The "remedy [is] intended to prevent the unjust enrichment of a person holding property under a duty to convey it or use for a specific purpose." *Gethsemane Lutheran Church v. Zacho*, 253 Minn. 469, 92 N.W.2d 905, 911–912 (1958).

> It is ... a well-established doctrine that where one person misappropriates property of another and converts it into another species of property, the defrauded party can assert equitable rights in the traceable product, unless the rights of a *bona fide* purchaser without notice have intervened.

*Thompson v. Nesheim*, 280 Minn. 407, 159 N.W.2d 910, 916 (1968).

■ The Minnesota courts have recognized three requirements for the imposition of a constructive trust:

1. The existence of an appropriate reason to override the status of legal title and ownership, which can consist of:

 a. the need to correct an abuse of a pre-existing fiduciary relationship, *Wilcox v. Nelson*, 35 N.W.2d at 744;

 b. the need to prevent unjust enrichment, *Thompson v. Nesheim*, 159 N.W.2d at 917; or

 c. the need to remedy the wrongful accession to title when it was obtained through fraud, oppression, duress, undue influence, force, crime, or similar means, *Wright v. Wright*, 311 N.W.2d 484, 485 (Minn.1981), and *Fredin v. Farmers State Bank of Mountain Lake*, 384 N.W.2d 532, 535 (Minn.App. 1986);

2. The existence of an identifiable *res*, or the traceable proceeds of it, to which the constructive trust may attach, *Thompson v. Nesheim*, 159 N.W.2d at 916, n. 1, and *Rock v. Hennepin Broadcasting Assoc., Inc.*, 359 N.W.2d 735, 739 (Minn. App.1984); and

3. Possession of the *res* or its traceable proceeds by the wrongdoer, or by a third-party transferee which was not a *bona fide* purchaser for value when it acquired the asset from the wrongdoer, *Blumberg v. Taggart*, 213 Minn. 39, 5 N.W.2d 388, 390 (1942); *Rock v. Hennepin Broadcasting Assoc., Inc.*, 359 N.W.2d at 739.

The Minnesota Supreme Court has opined that

> [t]he [constructive] trust ... is not created by the court, but is merely declared by the court to have arisen when a certain state of facts is shown ...

> The trust itself is a creature of equity, born of and contemporaneously with the wrongful diversion of the beneficiary's funds.

*Shearer v. Barnes*, 118 Minn. 179, 136 N.W. 861, 864 (1912). Positing that "the act of the adverse and inequitable withholding ... brings the constructive trust into being," the same court also has stated that "[w]hen the trust is imposed it relates back *as a remedy* to the time when the property was first conveyed ..." *Knox v. Knox,* 222 Minn. 477, 25 N.W.2d 225, 232 (1946) (emphasis in original). However,

[w]here the aid of a court of equity is sought to establish a trust ... by legal construction, the same diligence is required as in other equitable suits.

*Id.* (quoting *Randall v. Constans,* 33 Minn. 329, 23 N.W. 530, 534 (1885).

Given the requirement that a subject for the attachment of the trust *currently* exist, and given the mandate of positive and prompt assertion by the proponent, a more recent pronouncement by the Minnesota Court of Appeals is not really inconsistent with the Minnesota Supreme Court's earlier pronouncements:

A constructive trust is not, in itself, construed as a lien on or as affecting title to property; it does not exist so as to affect the property held by the wrongdoer until it is declared by a court as a means of affording relief.

*Bly v. Gensmer,* 386 N.W.2d 767, 769 (Minn. App.1986).

Thus articulated, the state law makes it quite clear why Defendant Leitner's theory cannot prevail. The reasons sound both under that law and under bankruptcy law.

The first one springs from the element of a constructive trust that requires a currently-existing asset that is subject to the legal claim of the putative trustee and the equitable claim of the putative beneficiary, and which itself is the subject of the suit, actually or virtually *in rem.* This is not the situation at bar. Defendant Leitner invokes the doctrine to defend the Plaintiff's legal claim for recovery of damages against his conservatee. The liquid and fungible asset to which he would have the Court attach a constructive trust is not before this Court, and was dispersed long before the Plaintiff put her claim into suit.

There is no extant case in which the Minnesota appellate courts have sanctioned the use of a constructive trust in a defensive fashion in an action at law for damages, to defeat a third party's recovery of the value of liquid assets after they were recommingled with other liquid assets of the putative bene-

ficiary, and after those assets in turn were dissipated. This probably reflects the origin of the doctrine itself, as an offensive remedy to establish a senior interest in a subject *res* whose current control and ownership are in actual controversy. While the remedy admittedly is subject to "no unyielding formula" and is intended to be a "remedial device," *Thompson v. Nesheim,* 159 N.W.2d at 916, Defendant Leitner's proposed extension of it goes too far beyond its defined boundaries to be cognizable in a federal court.[16]

The second reason is that it is just not possible to identify and trace the subject of the trust with a sufficient degree of specificity. In most of the reported decisions in which the Minnesota appellate courts upheld the imposition of a constructive trust against the proceeds of converted property, the proceeds consisted of real estate. *E.g., Forsblad v. Jepson,* 292 Minn. 458, 195 N.W.2d 429 (1972); *Thompson v. Nesheim; Wilcox v. Nelson; American Ry. Express Co. v. Houle,* 169 Minn. 209, 210 N.W. 889 (1926); *Shearer v. Barnes.* In others, the subject was personalty under the court's jurisdiction. *E.g., Petersen v. Swan,* 239 Minn. 98, 57 N.W.2d 842 (1953) (United States savings bonds); *Head v. Metropolitan Life Ins. Co.,* 449 N.W.2d 449 (Minn.App.1989), *rev. denied* (Minn.1990) (proceeds of life insurance policy); *Spiess v. Schumm,* 448 N.W.2d 106 (Minn.App.1989) ("pay-on-death" account in savings institution); *Matter of Estate of Kroyer,* 385 N.W.2d 31 (Minn.App.1986) (Totten trust account). None of the cases involved an asset that was fungible and intangible, like money on deposit, and that then was commingled and recommingled *throughout the relevant sequence of events.*

To be sure, the Minnesota courts have held that commingling of converted property with other assets belonging to the purported trustee, or even with assets of a third party, will not defeat the finding of a constructive trust. *Petersen v. Swan,* 57 N.W.2d at 846; *Thompson v. Nesheim,* 159 N.W.2d at 910; and *Cisewski v. Cisewski,* 129 Minn. 284, 152 N.W. 642, 643 (1915). They have even im-

---

**16.** In the scheme of federalism, the state courts are the proper institution to work such drastic modifications of their own precedent.

posed the burden of proof as to the segregation of the commingled assets onto the putative trustee. *Thompson v. Nesheim,* 159 N.W.2d at 918; *Petersen v. Swan,* 57 N.W.2d at 847. However, none of them have involved serial separations and recomminglings of liquid funds through the finances of a very active retail business like that involved here.

It is simply impossible to identify the specific funds that were deposited into the conservatorship account as the proceeds of those extracted from Debra Rice in the first instance, later transmuted into petroleum-product inventory, then to truck stop customers' payments, and on to deposits in the Debtor's account which were transferred to the conservatorship account. All the while the Debtor was paying the conservatorship account, it was also paying trade vendors, utilities, employees, and others that kept its operations going, out of the same business revenues. The record at bar just does not support a tracing of funds attached by a constructive trust, back to the conservatorship account.

The third reason goes to the first state-law element, the existence of an undesirable and unfair result, which the equitable remedy would prevent. However, its application is informed and structured by the substantive considerations of bankruptcy law. Defendant Leitner articulates his case on that element by focusing on Barbara Rice's breach of her fiduciary duty as conservator. However, the real issue is whether *the bankruptcy estate* would be unjustly enriched, were the Court to reject his client's invocation of equity. The proper context in which to view the argument, then, is the administration of a bankruptcy estate—and its unique considerations must drive the result on the constructive-trust issue.

Bankruptcy, of course, is a collective proceeding, in which the interests of all of a debtor's creditors are implicated, and in which a prioritized and ratable distribution from estate assets is mandated. The post-bankruptcy judicial imposition of "equitable" liens and interests against estate assets takes the value thus attached away from other claimants against the estate, who otherwise were situated similarly to the beneficiaries of such adjudications. Some courts have shown a readiness to allow this result. *E.g., In re General Coffee Corp.,* 828 F.2d 699 (11th Cir.1987); *In re Quality Holstein Leasing,* 752 F.2d 1009 (5th Cir.1985). However, the better-reasoned decisions frown upon it. *E.g., In re Omegas Group, Inc.,* 16 F.3d 1443, 1452–1453 (6th Cir.1994) (holding that unless constructive trust was judicially imposed before bankruptcy filing, it cannot be recognized in bankruptcy case where to do so would upset Bankruptcy Code's priority scheme); *Small v. Beverly Bank,* 936 F.2d 945, 949 (7th Cir.1991); *In re Stotler and Co.,* 144 B.R. 385, 388 (N.D.Ill.1992); *In re Johnson,* 174 B.R. 537, 542 (Bankr.W.D.Mo.1994). The Eighth Circuit Court of Appeals has recently fallen into the latter camp. *See In re Jeter,* 73 F.3d 205, 207, n. 2 (8th Cir.1996), *aff'g* 171 B.R. 1015, 1022–1024 (Bankr. W.D.Mo.1994).[17]

Basically, because the Debtor was and is in bankruptcy, a different sort of equity governs—and it is not inequitable to decline to recognize a constructive trust for the benefit of the transferee in the transactions at issue. *Cf. In re Morken,* 182 B.R. at 1022–1023 (quoting *In re Omegas Group, Inc.,* 16 F.3d at 1449); *In re Jeter,* 171 B.R. at 1023–1024.

As the Plaintiff has pointed out, there are numerous unsatisfied administrative-expense claims that arose while the Debtor was in Chapter 11. Many creditors other than Debra Rice supported the Debtor's post-petition operations by advances of credit. Because

---

17. In two other recent, but earlier decisions, the Eighth Circuit appeared to approve of the post-bankruptcy imposition of constructive trusts and similar equitable remedies. *Chiu v. Wong,* 16 F.3d 306 (8th Cir.1994); *Abramowitz v. Palmer,* 999 F.2d 1274 (8th Cir.1993). However, the *Jeter* court expressly distinguished *Chiu v. Wong* by noting that the subject asset there was the debtor's homestead real estate, claimed and allowed as exempt, so the bankruptcy policy in favor of insuring ratable distribution was not implicated. 16 F.3d at 308, n. 2. Another judge of this court accurately forecast the distinction in *Jeter* by noting the differing impact on general creditors' interests, between cases where exempt property would be the subject of a constructive trust and those where estate property would be. *In re Morken,* 182 B.R. 1007, 1023, n. 29 (Bankr. D.Minn.1995) (Kressel, J.).

her mother diverted some of the Debtor's revenues back into the conservatorship account, however, the majority of Debra Rice's post-petition advances were repaid. Other administrative-expense creditors were not so fortunate. The Plaintiff is chargeable with protecting their interests generally, and the bankruptcy process must be accountable to them. If unjust enrichment would result from either possible outcome, it would flow from a decision in favor of Defendant Leitner on the constructive-trust issue.

This Court cannot declare a constructive trust against assets long since dissipated, under the facts at bar. The funds transferred upon the honoring of the Debtor's checks were property of the estate. The Plaintiff has proved up the second element of § 549(a).

### D. Authorization By Bankruptcy Code

■ As his fourth line of defense, Defendant Leitner strikes at the "authorization" element of § 549(a)(2)(B). He acknowledges that the Debtor never sought or obtained a court order authorizing it to borrow money from Debra Rice, or to repay her with post-petition revenues. He maintains, however, that these transactions were a use of estate property in the ordinary course of business within the contemplation of 11 U.S.C. § 363(c)(1).[18]

This provision, of course, affords a safe harbor from later challenge for all mundane business transactions during a Chapter 11 case in which the debtor is actively engaged in business. In arguing that it protected the activity that Barbara Rice engineered between the conservatorship account and the bankruptcy estate, he relies on the fact that the Debtor's purchases of petroleum inventory were in the ordinary course of its business.

Unfortunately, he does not go beyond that. This ignores the real focus of the litigation.

The Plaintiff, after all, is not seeking to avoid the Debtor's payments to the petroleum vendors. Her target is the extensions of third-party credit that funded those payments.

The argument also elides the extraordinary nature of what happened. A going-concern business in bankruptcy can indeed "obtain unsecured credit and incur unsecured debt in the ordinary course of business" without prior court authorization. 11 U.S.C. § 364(a). However, Barbara Rice's surreptitious arrangements through the conservatorship account were anything but ordinary-course transactions. This inquiry is governed by the two-part test of *In re Waterfront Cos.*, 56 B.R. at 34–36, which uses a "horizontal dimension" and a "vertical" one.

There is no evidence in the record to meet the former, which goes to whether the transactions with the conservatorship fell within a range of accepted practices in the Debtor's particular industry. As the proponent of the defense, Defendant Leitner failed to meet his burden of production. Beyond that, the transactions certainly did not meet the "vertical dimension," which is prompted by the legal status of the Debtor as a petitioner for bankruptcy reorganization. Creditors would have been very interested to know that the Debtor was so close to the line of failure. They certainly would have wanted the opportunity to object to the very unorthodox extensions of credit and to the repayment of them at the expense of other accruing claims.

The payments to the conservatorship account were clearly outside the ordinary course, and not authorized by § 363(c)(1). No other provision of the Bankruptcy Code authorized the payments. The Court did not authorize them. The Plaintiff has proved up the fourth element, as established by § 549(a)(2)(B).

### E. Liable Party

■ Defendant Leitner's fifth defense

---

**18.** This statute provides, in pertinent part:

> If the business of the debtor is authorized to be operated under ... [11 U.S.C. § ] 1108 ... and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

As a debtor in possession under Chapter 11, of course, the Debtor had the rights and powers, as well as the duties, of a trustee in bankruptcy. 11 U.S.C. § 1107(a).

goes to 11 U.S.C. § 550.[19] Noting that he was not appointed until after the transfers at issue, he argues that judgment cannot be rendered under the state of the Plaintiff's pleadings. He cites two reasons:

1. He was not the "initial transferee" of the funds, because he was not in charge of the conservatorship when the Debtor's checks were honored; and

2. Because a conservatorship estate is not a separate legal entity under Minnesota law, neither he nor the conservatorship are an "immediate or mediate transferee of [the] initial transferee."

As to the principles of guardianship and conservatorship [20] under Minnesota law, this argument is more noteworthy for what it does not acknowledge than for what it does. If one recognizes the most basic of those principles, the argument reveals an untenable tautology.

 As a conservator, Barbara Rice had no estate, title, or personal interest in the property of her conservatee. *Hoverson v. Hoverson*, 216 Minn. 237, 12 N.W.2d 497, 500 (1943). *See also Martineau v. City of St. Paul*, 172 F.2d 777, 780 (8th Cir.1949) (applying Minnesota law). A conservator can be vested with the duty to "represent the ... conservatee in any court proceedings," Minn. Stat. § 525.56 subd. 4(3), which both Barbara Rice and Defendant Leitner were by order of the Hennepin County District Court. Even though "[t]he [conservator] is a proper party for the record and has control of the prosecution of the action," the conservatee

should be named as a party in the caption of the action. *Martineau v. City of St. Paul*, 172 F.2d at 780. Nonetheless, in all such cases the conservatee, and not the conservator, is the real party in interest. *Dougherty v. Oberg*, 297 F.Supp. 635, 640 (D.Minn.1969) (applying Minnesota law).

It is clear, then, that Debra Rice's legal personality was not supplanted by the commencement of the conservatorship, or by the change in conservators. To ensure that her rights were protected during the period of her incapacity, she could sue or be sued through the intercession of her conservator. This has happened, both offensively and defensively, during the Debtor's bankruptcy case.[21] Thus, though her current conservator is the nominal party-defendant, she, as conservatee, remains the liable entity. Because Debra Rice's current assets are under the jurisdiction of the Hennepin County District Court, satisfaction of any resulting claim can come only through the conservatorship.[22]

The tautology in Defendant Leitner's position shows if one considers the logical outcome of his argument. Had the Plaintiff named only Debra Rice as the subject party-defendant, Leitner surely would have moved to dismiss on the ground that she lacked capacity to be sued. On the other hand, he is now arguing that he, her current legal representative, is not properly named as a party-defendant, even though he assumed that capacity and even though the transfers in question were made to his conservatee. Under Defendant Leitner's argument, the

---

**19.** This statute effectuates the various avoidance remedies of a trustee in bankruptcy by identifying her rights of recovery and those from whom she may recover:

 (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under [11 U.S.C. § ] 549 ... the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
 (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
 (2) any immediate or mediate transferee of such initial transferee.

**20.** Under the current Minnesota statute, the legal concept of "conservatorship" is a subset of "guardianship." Under the definition of Minn.

Stat. § 525.539 subd. 2, a "guardian" is one "appointed by the court to exercise all of the duties designated in [Minn.Stat. § ]525.56 for the care of an incapacitated person or that person's estate, or both," and under the definition of Minn.Stat. § 525.539 subd. 3 a "conservator" is one "appointed to exercise some, but not all" of those powers.

**21.** The offensive use, of course, occurred when Defendant Leitner filed a proof of claim on her behalf.

**22.** This is indeed what the Plaintiff proposes—to file a proof of claim in the conservatorship proceeding, based on the adjudication before this Court, and to obtain payment on it through that court's procedures.

Plaintiff could not commence suit against anyone—other than, possibly, the person who engineered the transfers.[23] If, as Defendant Leitner argues, the conservatorship "estate" is not a legal entity itself against which liability will attach, this simply cannot be.[24]

Given the strong suggestion of state law, the Plaintiff's failure to formally name Debra Rice as a party-defendant is problematic, but only as a point of technicality. Defendant Leitner afforded her a zealous defense, as was his duty. No one can deny that she was a full participant, personally and through him, throughout the litigation. The minor conundrum caused by the wording of the caption is simply resolved—by naming Debra Rice as the party from whom the Plaintiff shall have her recovery, subject to the strictures of the guardianship. She, after all, is "the entity for whose benefit" the Debtor made the avoidable payments, within the contemplation of § 550(a)(1),[25] and under state law she is the real party in interest as defendant.

### F. Setoff and Recoupment

■ As his last argument, Defendant Leitner maintains that all or part of Debra Rice's claim against the bankruptcy estate should be set off against the amount of any judgment under § 549 rendered here, so as to reduce or eliminate her net liability. As noted earlier, Debra Rice's claim has two major components, one arising before the Debtor's bankruptcy filing, and the other post-petition. It is not completely clear whether Defendant Leitner seeks setoff (or some similar remedy) as to both of these components, but it is appropriate to discuss this defense as if he did.

The distinction between the two components is important, because it controls the availability of two different theories by which cross-running claims may be netted out in a bankruptcy case. 11 U.S.C. § 553[26] preserves the right of setoff in bankruptcy cases, but it does so only for mutual debts that both arose pre-petition. *In re Matthieson*, 63 B.R. 56, 58–59 (D.Minn.1986); *In re American Central Airlines, Inc.*, 60 B.R. 587, 589–590 (Bankr.N.D.Iowa 1986). The component of Defendant Leitner's claim that is evidenced by the two promissory notes arose pre-petition, but the Plaintiff's avoidance recovery arose post-petition. By the simple terms of § 553(a), these claims cannot be set off.[27]

■ Though setoff is not available as to the larger component of Defendant Leitner's claim, the related doctrine of recoupment deserves some discussion. Though the Code

---

**23.** Though counsel's argument on this point was somewhat vague, one gets the impression that he sees Barbara Rice as the only person properly named as a liable defendant for the avoidance of the transfers in question. Barbara may indeed face some liability on account of this sequence of events, but it is not to the bankruptcy estate.

**24.** Counsel cites *Kluczny v. Matz*, 187 Minn. 93, 244 N.W. 407 (1932), for the proposition that the conservatorship, whether deemed an "estate" or only an "account," lacks legal standing. It was only in passing that the *Kluczny* court observed that "the estate as such was not an entity which could be a payee of the note" whose enforceability was at issue. 244 N.W. at 408. Nonetheless, the point accords with the other basic precepts of guardianship and conservatorship noted earlier, and to Defendant Leitner's detriment—because later in the opinion, the *Kluczny* court held that the successor guardian, and his ward, were subject to defenses on the note that had arisen from the misconduct of his predecessor, and the estate's

relief against the guardian's bondsmen so far as this record show[ed was] still available. *Id.*

**25.** This simple point decisively defeats all of Defendant Leitner's arguments over the status of transferees in the legal chain of the conservatorship.

**26.** Subject to exceptions not applicable here, 11 U.S.C. § 553(a) provides.

... [the Bankruptcy Code] does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the [bankruptcy] case ... against a claim of such creditor against the debtor that arose before the commencement of the case ...

**27.** It may also be said that such claims lack mutuality in the common-law sense, because they separately arose as to an entity—the debtor—that achieved a very different legal status when it became a debtor in possession under Chapter 11. *In re American Central Airlines, Inc.*, 60 B.R. at 590.

does not expressly recognize its applicability, a number of courts have held that, as a general proposition, it is available for the netting of cross-running claims whose geneses spanned a debtor's bankruptcy filing. *E.g., In re University Medical Center,* 973 F.2d 1065, 1079 (3d Cir.1992); *In re Davidovich,* 901 F.2d 1533, 1537 (10th Cir.1990); *Lee v. Schweiker,* 739 F.2d 870, 875 (3d Cir. 1984). Recoupment, however, is limited to the situation where the obligations "arise out of a single, integrated transaction." *United States v. Dewey Freight System, Inc.,* 31 F.3d 620, 623 (8th Cir.1994) (quoting *In re University Medical Center,* 973 F.2d at 1081; *In re NWFX, Inc.,* 864 F.2d 593, 597 (8th Cir.1989)). *See also In re Davidovich,* 901 F.2d at 1538. This limitation is particularly appropriate in bankruptcy cases, in which the governing statute gives very different priorities to claims depending on whether they arose pre- or post-petition. *United States v. Dewey Freight System, Inc.,* 31 F.3d at 623.

 Given this limitation, it is clear that Defendant Leitner is not entitled to recoup his conservatee's pre-petition claim against the Plaintiff's avoidance recovery. The earlier claim arose out of two distinct advances of conservatorship funds to the Debtor, evidenced by notes and subject to fixed repayment terms. By contrast, the Plaintiff's claim arose out of something that superficially resembled a revolving line of credit, whose terms were never reduced to writing and were much more *ad hoc.* While the separate claims involved the same parties and the same general source of funds, they simply did not arise under a single, integrated contract or other transaction.

 This leaves the request for setoff that Defendant Leitner did clearly frame in brief and argument, which would apply to his conservatee's asserted post-petition claim and the Plaintiff's avoidance recovery. Section 553, of course, does not speak to the availability of setoff in such a situation. The courts have split on the question of whether, as a matter of "equity," setoff of post-petition claims should be permitted. Some have allowed it, to the extent that the proponent otherwise meets the requirements of setoff under state common law. *In re Davidson*

*Lumber Sales, Inc.,* 66 F.3d 1560, 1569 (10th Cir.1995); *In re Buckley & Assoc. Ins., Inc.,* 78 B.R. 155, 158 (E.D.Tenn.1987); *In re Mohawk Indust., Inc.,* 82 B.R. 174, 178–179 (Bankr.D.Mass.1987); *In re Fordson Engr. Corp.,* 25 B.R. 506, 511 (Bankr.E.D.Mich. 1982); *In re Shoppers Paradise, Inc.,* 8 B.R. 271, 277 (Bankr.S.D.N.Y.1980). Others, however, have questioned whether allowing setoff of post-petition claims comports with the Bankruptcy Code's scheme for prioritized and ratable distribution. *E.g., In re 222 Liberty Assoc.,* 110 B.R. 196, 202 (Bankr. E.D.Pa.1990).

Ultimately, the decision to grant or deny such a setoff is "guided by equity." *In re Buckley & Assoc. Inc.,* 78 B.R. at 158. *See also Diversa–Graphics, Inc. v. Mgmt. & Tech. Serv. Co.,* 561 F.2d 725, 728 (8th Cir. 1977) (decided under Bankruptcy Act of 1898). In turn, the Bankruptcy Court's

> broad equitable powers may only be exercised in a manner which is consistent with the provisions of the [Bankruptcy] Code,

*Johnson v. First Nat'l Bank of Montevideo,* 719 F.2d 270, 273 (8th Cir.1983), and

> whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code,

*Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988).

Guided by this precept, one court has declined to allow a defendant to raise the defense of setoff to a trustee's § 549(a) action, under facts that are similar in many respects to the ones at bar. *In re Garofalo's Finer Foods, Inc.,* 186 B.R. 414, 432–435 (N.D.Ill. 1995), *aff'g* 164 B.R. 955 (Bankr.N.D.Ill.1994). In *Garofalo's Finer Foods,* a bank had continued to honor overdrawn checks issued by a debtor in possession under Chapter 11, and later credited for the amounts of the honored NSF checks by exercising setoff against funds later deposited by the debtor. Neither the debtor nor the bank disclosed this revolving-credit arrangement while the case remained under Chapter 11, and neither obtained court approval for the repayment brought about by the setoff. On the bank's appeal from a judgment in favor of the trust-

ee[28] under § 549(a), the District Court held that

> the bankruptcy court property concluded that it did not have the authority ... to award any equitable relief in contravention of the Code's unambiguous provisions ... under § 549(a), and affirmed the bankruptcy court's rejection of the bank's defense that it had had a right to set off its post-petition claim against the debtor's post-petition claim as depositor of funds with it.

186 B.R. at 434–435. *Accord, In re Baxco Corp.,* 148 B.R. 855, 860 (Bankr.N.D.Ill. 1992).

On balance, the approach of *Garofalo's Finer Foods* is by far the more defensible one; it gives effect to unambiguous provisions of §§ 549 and 550 in a way consonant with the "plain-meaning" jurisprudence repeatedly applied by the Supreme Court in its recent bankruptcy decisions, and it certainly promotes the goal of ratable distribution of the estate of a failed Chapter 11 debtor. This conclusion, then, requires the rejection of Defendant Leitner's defense of setoff. Once his conservatee has satisfied the Plaintiff's judgment, she may share *pro rata* from the Chapter 7 estate on the basis of her allowed claim.

### Conclusion.

The honoring of the Debtor's checks, then worked a post-petition transfer of property of the bankruptcy estate that was not authorized by the Bankruptcy Code or by order of this Court. The Plaintiff has proved up all of the straightforward elements of 11 U.S.C. § 549(a), and is entitled to a judgment in her favor.[29] There is no just reason for delaying entry of that judgment.[30]

### ORDER FOR JUDGMENT

Upon the foregoing Findings of Fact and Conclusions of Law,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. Debra Rice, currently the conservatee of Defendant Mark R. Leitner, received the sum of $87,550.00 from the bankruptcy estate of the Debtor during the pendency of the Debtor's case under Chapter 11, in a series of transfers that were neither authorized by an order of this Court nor authorized by any term of the Bankruptcy Code.

2. Accordingly, the transfers identified in Term 1 are avoided pursuant to 11 U.S.C. § 549(a).

3. Pursuant to 11 U.S.C. § 551, the transfers avoided under Term 2 are preserved for the benefit of the Debtor's estate under Chapter 7.

---

28. The case was converted to one under Chapter 7 after the debtor failed to consummate its confirmed plan. 186 B.R. at 420. This is another point of similarity with the case at bar, though not a material one.

29. The length of this decision should illustrate that this is not an easy conclusion. Nor, really, is it a very savory one. Of the several participants in the relevant events, only Debra Rice has any claim to sympathy. Hers is a powerful claim, stemming as it does from her victimization under a dual breach of fiduciary duty, at the hands of her own mother. Nonetheless, in the specific context of bankruptcy, the law compelled the result obtained—as hard and cold as that seems, and is. The plain language of the statute subjects the payments to avoidance, and it simply does not contain an exception that would apply to her situation. *See In re Photo Promotion Assoc., Inc.,* 881 F.2d 6, 10 (2d Cir.1989); *In re Ward,* 837 F.2d 124, 127 (3d Cir.1988).

30. This certification is made pursuant to FED. R.CIV.P. 54(b), as incorporated by FED.R.BANKR.P.

7054(a). The Plaintiff sued out a total of 13 counts in her amended complaint, which joined a variety of avoidance claims, pre- and post-petition, against several named defendants. Only Count IX sounded against Defendant Leitner. Early on, he successfully moved for a severance of the trial on the count against him, on the argument that Count IX was wholly distinct from the other counts and its resolution ought not to be delayed by the litigation of the others to merit granting the motion. At Leitner's insistence, then, this established that there is no significant relationship between Count IX and the unadjudicated counts, *In re Flight Transportation Corp. Securities,* 825 F.2d 1249, 1251 (8th Cir.1987), *cert. denied,* 485 U.S. 936, 108 S.Ct. 1113, 99 L.Ed.2d 273 (1988); thus, the concerns over piecemeal appeals voiced in *Interstate Power Co. v. Kansas City Power & Light Co.,* 992 F.2d 804 (8th Cir.1993), are not warranted here. The present adjudication fully and finally disposes of all issues relating to Count IX, *In re Lull Corp.,* 52 F.3d 787, 788 (8th Cir.1995), so it is only appropriate to enter judgment now.

4. Pursuant to 11 U.S.C. § 550(a), the Plaintiff shall recover from Debra Rice the sum of $87,550.00, together with such interest, costs, and disbursements as the Plaintiff may hereafter tax pursuant to applicable statute or rule.

5. The Plaintiff's recovery against Debra Rice shall be through the instrumentality of Debra Rice's conservatorship, presently under the jurisdiction of the Minnesota State District Court for the Fourth Judicial District, Hennepin County, for so long as that conservatorship continues, and may be had against Debra Rice personally if that conservatorship is terminated at any point before the Plaintiff's judgment against Debra Rice is fully satisfied.

LET JUDGMENT BE ENTERED ACCORDINGLY.