In re John D. MORKEN and Dorothy M. Morken, Debtors.

Phillip L. KUNKEL, Trustee for the Estate of John D. Morken and Dorothy M. Morken, Plaintiff,

v.

Charles W. RIES, Trustee for the Estate of Spring Grove Livestock Exchange, Inc.; Farm Credit Services of Southern Minnesota, ACA, a Minnesota corporation; Sprague National Bank, a United States corporation; Security State Bank of Sheldon, an Iowa corporation; Firstar Bank Milwaukee, N.A., an United States corporation; Brenton Brothers, Inc., an Iowa corporation; Bracht Feedyards, Inc., a Nebraska corporation; Busse Feedlot, Inc., an Iowa corporation; Farmers Co-op Society, an Iowa corporation; Robert Eason d/b/a Eason Feedlots; James Easton d/b/a Easton Feedlot; Jeff Anema d/b/a Floyd Feedlot; Richard Hansen d/b/a Hansen Feed Yards; Larryann Hunt, Inc., an Iowa corporation; L/B Feedlot, a Nebraska partnership; Dixon County Feedyard Co., a Nebraska corporation; Oak Ridge Feedlot, Inc., an Iowa corporation; Oshkosh Feed Yard, Inc., a Nebraska corporation; Ruser Venice Feedlots, Inc., a Nebraska corporation; Schomers Brothers, Inc., an Iowa corporation; Wayne

Schut, d/b/a Schut Feedlot; Valley View Feedlots, Inc., an Iowa corporation; Westview of Monroe, Inc., an Iowa corporation; West Central Cattle Company, an Iowa corporation; Willberg Cattle Co., an Iowa corporation, Defendants.

Bankruptcy No. 4–94–2954.
Adv. No. 4–94–555.

United States Bankruptcy Court,
D. Minnesota.

Aug. 27, 1996.

Thomas P. Melloy, Hall & Byers, P.A., St. Cloud, Minnesota, Jerome A. Miranowski, Oppenheimer, Wolff & Donelly, Minneapolis, Minnesota, for Plaintiff.

William S. Partridge, Farrish, Johnson & Maschka, Mankato, Minnesota, Gary W. Koch and David W. Sturges, Gislason, Dosland, Hunter & Malecki, New Ulm, Minnesota, James M. Caragher and Thomas L. Shriner, Jr., Foley & Lardner, Milwaukee, Wisconsin, Clark T. Whitmore, Maslon, Edelman, Borman & Brand, Minneapolis, Minnesota, for Defendants.

## MEMORANDUM ORDER

ROBERT J. KRESSEL, Bankruptcy Judge.

This adversary proceeding came on for trial on May 13–17, 1996. Thomas P. Melloy and Jerome A. Miranowski appeared for the plaintiff. William S. Partridge appeared for Charles W. Ries. Gary W. Koch and David W. Sturges appeared for Farm Credit Services of Southern Minnesota, ACA. Thomas L. Shriner, Jr., Clark T. Whitmore, and James M. Caragher appeared for Firstar Bank Milwaukee, N.A., and Sprague National Bank.

This court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334, and Local Rule 201. This is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (F), (H), (K) and (O ).

## I. FACTUAL BACKGROUND

### A. The Debtors

Prior to June 10, 1994, John and Dorothy Morken were engaged in the business of raising, fattening and marketing cattle in the Upper Midwest. In addition, John Morken was the sole shareholder and president of Spring Grove Livestock Exchange, Inc.,[1] a corporation previously owned by his father.

SGLE was in the business of purchasing both fat cattle and feeder cattle. Fat cattle are bought from third parties and sold directly to packers for slaughter and feeder cattle require fattening for three to six months prior to slaughter. Customarily, SGLE purchased feeder cattle from third parties and then resold them to Morken and others for fattening.

### B. The Lending Institutions

To finance their personal business as well as SGLE's operations, the Morkens had accounts with several lending institutions, including Sprague National Bank[2], Firstar Bank Milwaukee, N.A.[3], and Farm Credit Services of Southern Minnesota, ACA.[4]

Sprague was the Morkens and SGLE's primary lender until 1992. The Morkens and SGLE's business accounts were established at Sprague. In addition, Sprague provided Morken with financing to purchase cattle. On February 28, 1993, and May 31, 1994, respectively, the Morkens and Sprague executed an Amended and Restated Term Note in the amount of $316,149.50 and an Amended and Restated Revolving Credit Note in the amount of $1,650,000.00. Sprague is a secured creditor of the Morkens.

Firstar's relationship with the Morkens and SGLE began indirectly in 1988 when Firstar purchased a participation in a secured loan Sprague had made to Morken. It was not until 1992 that Firstar established a direct loan relationship with SGLE and the Morkens. In June 1992, SGLE and Firstar, then known as First Wisconsin, executed a Demand Line of Credit Agreement and Note in the principal amount of $1.5 million. In May 1993, after First Wisconsin became Firstar, Firstar and SGLE executed a new agreement and note documenting the $1.5 million line of credit. In addition, both

---

1. Spring Grove Livestock Exchange, Inc., is a Minnesota corporation with its principal place of business in Spring Grove, Minnesota.

2. Sprague National Bank is a national banking association with its principal place of business in Caledonia, Minnesota.

3. Firstar Bank Milwaukee, N.A., is a national banking association with its principal place of business in Milwaukee, Wisconsin.

4. Farm Credit Services of Southern Minnesota, ACA, is an instrumentality of the United States which has its principal place of business in Mankato, Minnesota.

SGLE and the Morkens opened business accounts with Firstar. Firstar established a joint checking account for the Morkens and a control disbursement account for SGLE.[5] Firstar is a secured party of SGLE.

The Morkens' relationship with FCS began in December 1991 when Farm Credit Services of Southeast Minnesota, a predecessor of FCS, entered into two promissory note agreements with the Morkens in the amounts of $189,945 and $671,668. After the merger of Farm Credit Services of Southeast Minnesota and FCS on July 1, 1993, FCS entered into a new revolving credit facility with the Morkens with a limit of $5.25 million. To fund the FCS revolver, FCS established two "payable through" draft accounts at Norwest Bank in Northfield, Minnesota. These accounts effectively acted as a single account. When drafts were written on one account, the resulting debt was repaid by deposits into the other account. FCS is a secured creditor of the Morkens.

### C. The U.C.C. Filings

All of the secured creditors were granted security interests in either the Morkens or SGLE's property and, in turn, made U.C.C. filings to perfect their interests in the collateral.

#### 1. Sprague

On August 9, 1991, the Morkens granted Sprague a security interest in all their inventory, equipment, farm products, accounts and general intangibles. Sprague filed financing statements with the Minnesota Secretary of State on November 16, 1988,[6] and the Hous-

ton County Recorder, Houston County, Minnesota, on November 14, 1988.[7] Sprague filed another financing statement with the Houston County Recorder on December 14, 1990.

Outside of Minnesota, Sprague filed a financing statement with the Iowa Secretary of State on December 29, 1986[8] and, on the eve of bankruptcy, filed security agreements as non-standard financing statements with the county clerk in four Nebraska counties:

1. Antelope County on June 8, 1994.
2. Cuming County on June 9, 1994.
3. Garden County on June 8, 1994.
4. Dixon County on June 9, 1994.

On October 23, 1992, Sprague executed a subordination agreement in favor of Farm Credit Services of Southeast Minnesota which subordinated its security interest in all cattle financed by Farm Credit Services of Southeast Minnesota and all cattle located in Iowa to the security interest of Farm Credit Services of Southeast Minnesota.

#### 2. Firstar

On June 3, 1992, SGLE and Firstar executed a General Business Security Agreement and Note in the amount of $1.5 million and a Farm Security Agreement granting Firstar a security interest in all equipment, livestock, crops, livestock feed, farm supplies, inventory, documents relating to inventory, general intangibles, accounts and contract rights owned by SGLE. The Morkens also executed a Continuing Guaranty of the SGLE debt to Firstar. On May 3, 1993, the Morkens executed a Reaffirmation of Guarantee.

---

5. The control disbursement account was created pursuant to the following agreements between SGLE and Firstar:

    1. A Wholesale Lockbox Authorization agreement, dated January 28, 1992, established a lockbox in Milwaukee, Wisconsin, to allow quicker presentation and collection of checks payable to SGLE;

    2. A Control Disbursement Authorization agreement, dated January 28, 1992, allowed Firstar to provide control disbursing services, including transferring funds from the SGLE account at Firstar Milwaukee to the disbursement account at Firstar Wausau.

    3. A Funds Transfer Agreement, dated March 17, 1992, allowed Firstar Milwaukee to transfer funds from the SGLE account at Firstar Milwaukee to the disbursement account at Firstar Wausau.

    4. An On–Line Bankers Services Agreement, dated April 27, 1992, authorized Firstar Milwaukee to provide SGLE account information through on-line banking services.

6. This was continued by the filing of a continuation statement on October 25, 1993.

7. This was continued by the filing of a continuation statement on October 15, 1993.

8. This was continued by the filing of a continuation statement on November 7, 1991, and on June 9, 1994.

Pursuant to its security agreements with SGLE, Firstar filed financing statements on June 3, 1992, and June 4, 1992, with the Houston County Recorder and the Minnesota Secretary of State respectively.

Firstar did not file any financing statements outside of Minnesota until shortly before bankruptcy. On June 9, 1994, Firstar filed security agreements as non-standard financing statements with the Iowa and Nebraska Secretaries of State. Firstar also filed security agreements as non-standard financing statements with the county clerk in five Nebraska counties:

1. Antelope County on June 8, 1994.
2. Cuming County on June 8 and 9, 1994.
3. Garden County on June 8, 1994.
4. Dixon County on June 8, 1994.
5. Phelps County on June 9, 1994.

### 3. FCS

The Morkens executed four promissory notes with Farm Credit Services of Southeast Minnesota and FCS:

1. With Farm Credit Services of Southeast Minnesota on December 18, 1991, in the original principal amount of $189,945.00;
2. With Farm Credit Services of Southeast Minnesota on December 18, 1991, in the original principal amount of $671,668.00;
3. With FCS on November 18, 1993, in the original principal amount of $5,250,000.00.
4. With FCS on February 9, 1994, in the original principal amount of $315,-000.00;

On October 23, 1992, the Morkens executed a security agreement granting Farm Credit Services of Southeast Minnesota a security interest in all livestock, proceeds from livestock, accounts and general intangibles owned by the Morkens.

Pursuant to the security agreement, Farm Credit Services of Southeast Minnesota filed financing statements with the Houston County Recorder on October 26, 1992, and the Minnesota Secretary of State on October 27, 1992. Outside of Minnesota, Farm Credit Services of Southeast Minnesota filed financing statements on October 27, 1992, with the Iowa and Nebraska Secretaries of State. Farm Credit Services of Southeast Minnesota and, later, FCS filed financing statements with the county clerk in four Nebraska counties:

1. Douglas County on March 25, 1993, and August 20, 1993.
2. Antelope County on May 12, 1993, and August 19, 1993.
3. Cuming County on October 27, 1992, November 5, 1992, March 24, 1993, May 12, 1993, and August 26, 1993.
4. Dixon County on August 19, 1993, and August 26, 1993.

### D. The Morkens and SGLE's Relationship with Firstar

In 1992, the Morkens and SGLE established direct banking relationships with Firstar. The Morkens opened a business checking account and SGLE opened a $1.5 million line of credit with Firstar. Mark Miley, their correspondent banker at Firstar, recommended that SGLE manage its line of credit through a control disbursement account which allowed SGLE immediate access to funds received from purchasers of cattle prior to final payment of these checks by the relevant drawee bank. SGLE's control disbursement account consisted of two related accounts, a funding account located at Firstar Milwaukee and a disbursement account located at Firstar Wausau, Firstar Milwaukee's affiliate. The funding account received SGLE deposits through a Firstar lockbox located in Milwaukee. Firstar then daily transferred money from the funding account to the disbursement account to cover checks drawn on the disbursement account. All SGLE checks were drawn on the disbursing account and, because the drawee was Firstar Wausau, SGLE obtained a one day float.

Float allows a depositor to make withdrawals against uncollected funds. Although better reporting was the reason Miley gave when he suggested that SGLE manage its line of credit through a control disbursement account, Miley and Morken discussed the advantages of the float that this type of account created. Creating a float was crucial

enough to this decision that the disbursement account and the funding account were deliberately established geographically far apart so as to guarantee the extra day of float. Furthermore, to further ensure the availability of float, Firstar credited deposits to the funding account more often than withdrawals.

From the inception of these accounts, the Morkens and SGLE carried overdraft balances which Firstar paid regardless of the amount of funds the Morkens and SGLE had in their accounts. In compliance with Firstar policy regarding the payment of overdrafts, Miley and his supervisor, Alfonso Buscemi, signed off on the daily reports showing the amount of uncollected balances in the accounts in order for Firstar to honor the overdrafts. However, this practice became so routine that they would complete this paperwork in batches without reading the reports. For the thirteen months prior to Firstar stopping payment on checks, the Morkens and SGLE's accounts had the following uncollected balances:

### John and Dorothy Morken Account 121575185

| | |
|---|---|
| May 1993 | $ 2,962,360 |
| June 1993 | $ 2,753,457 |
| July 1993 | $ 4,358,321 |
| August 1993 | $ 6,443,322 |
| September 1993 | $ 7,538,649 |
| October 1993 | $ 6,719,406 |
| November 1993 | $ 7,142,516 |
| December 1993 | $ 7,258,100 |
| January 1994 | $ 8,608,140 |
| February 1994 | $ 9,464,154 |
| March 1994 | $13,028,564 |
| April 1994 | $16,037,269 |
| May 1994 | $21,746,839 |

### SGLE Account 112921293

| | |
|---|---|
| May 1993 | $ 1,412,631 |
| June 1993 | $1,656,823 |
| July 1993 | $1,490,168 |
| August 1993 | $1,804,218 |
| September 1993 | $1,783,485 |
| October 1993 | $2,105,219 |
| November 1993 | $2,707,179 |
| December 1993 | $2,065,265 |
| January 1994 | $2,420,653 |
| February 1994 | $3,030,070 |
| March 1994 | $3,813,444 |
| April 1994 | $4,759,054 |
| May 1994 | $5,158,235 |

In spite of the significant amounts of the daily and monthly uncollected balances, Firstar continued to pay the overdrafts and view the Morkens and SGLE as preferred customers.

In the spring of 1994, Firstar invited the Morkens to its home office in Milwaukee to entertain them as, in Miley's words, "super customers" in an effort to sell them and SGLE related products. As late as May 31, 1994, three days before it stopped honoring checks, Firstar renewed both its $1.5 million line of credit to SGLE and the Sprague originated $273,000 note extended to the Morkens, and increased the Sprague originated revolver to the Morkens from $1.1 million to $1.65 million despite concerns over the amount of the overdrafts raised during a March 1994 internal audit of the Morkens and SGLE's accounts. Although Firstar voiced its concerns over the increased activity between the accounts, it readily accepted Morken's explanation that this was due to business as usual.

Firstar's failure to demand a more detailed explanation from Morken and its dismissal of

the questions raised by its own internal records were due at least in part to the substantial amounts of revenue it was generating from service charges on the uncollected funds balances in the accounts. Firstar made every effort to accommodate the Morkens and SGLE and retain their business, including reducing the number of cattle inspections it conducted from monthly to quarterly when Morken complained about the inconvenience of monthly inspections. It even examined whether increasing the charges assessed on the uncollected balances in the accounts to prime plus two percent would affect its relationship with the Morkens and SGLE.

In the thirteen months prior to dishonoring the Morkens and SGLE's checks, Firstar earned a total of $955,479 in service charges on the Morken and SGLE accounts:

John and Dorothy Morken Account 121575185

| | |
|---|---|
| May 1993 | $ 17,709 |
| June 1993 | $ 15,876 |
| July 1993 | $ 26,130 |
| August 1993 | $ 38,488 |
| September 1993 | $ 43,372 |
| October 1993 | $ 39,769 |
| November 1993 | $ 41,093 |
| December 1993 | $ 43,296 |
| January 1994 | $ 51,326 |
| February 1994 | $ 51,116 |
| March 1994 | $ 78,596 |
| April 1994 | $ 98,191 |
| May 1994 | $147,495 |
| | |
| TOTAL | $692,457 |

SGLE Account 112921293

| | |
|---|---|
| May 1993 | $ 12,171 |
| June 1993 | $ 14,003 |
| July 1993 | $ 12,791 |
| August 1993 | $ 15,157 |
| September 1993 | $ 15,002 |
| October 1993 | $ 15,505 |
| November 1993 | $ 18,652 |
| December 1993 | $ 16,164 |
| January 1994 | $ 18,756 |
| February 1994 | $ 23,258 |
| March 1994 | $ 29,226 |
| April 1994 | $ 33,513 |
| May 1994 | $ 38,824 |
| | |
| TOTAL | $263,022 |

### E. Transactions Which Led to This Proceeding

By the beginning of 1994, because of downturns in the cattle market and other business losses, the Morkens and SGLE were having financial difficulties. In order to continue financing their cattle businesses, they engaged in a series of transactions in which they made use of the float to conceal the absence of collectible funds in their accounts.[9] The bank accounts involved in these

9. This is commonly referred to as check kiting which typically works when a "check kiter opens an account at Bank A with a nominal deposit. He then writes a check on that account for a large sum, such as $50,000. The check kiter then opens an account at Bank B and deposits the $50,000 check from Bank A in that account. At the time of deposit, the check is not supported by sufficient funds in the account at Bank A. However, Bank B, unaware of this fact, gives the check kiter immediate credit on his account at Bank B. During the several-day period that the check on Bank A is being processed for collection from that bank, the check kiter writes a

transactions were SGLE's control disbursement account with Firstar, the Morkens' personal checking account with Firstar and the Morkens' line of credit with FCS.

Morken knew that Firstar would routinely make deposits into the disbursement account according to SGLE's needs regardless of whether there were sufficient funds in the funding account to cover checks drawn on the disbursement account. Originally, SGLE treated this arrangement as short term credit for which it paid fees and service charges determined by the account's uncollected balances. However, by 1994, SGLE was abusing this arrangement and using it to its advantage to create more funds for itself. SGLE wrote checks on its disbursement account to third parties even though it knew it lacked sufficient revenues to cover payment of these checks. To conceal the absence of funds, SGLE daily deposited into its account millions of dollars of checks drawn on the Morkens' accounts at both Firstar and FCS. The Morkens also lacked sufficient funds to honor the checks written on their accounts, thus SGLE would write offsetting checks on its Firstar account for deposit into the Morkens' accounts at Firstar and FCS. Each banking day, John Morken prepared a series of checks drawn on SGLE's control disbursement account made payable to himself and a series of checks drawn on the Morkens' personal account at Firstar and FCS made payable to SGLE. Although each series of checks consisted of individual checks drawn in different amounts, the total amount of each series of checks was identical. Due to the one day float in both SGLE's control disbursement account and the Morkens' line of credit with FCS, these transactions made it appear as though there were sufficient funds in SGLE's account to cover checks being paid out and that the Morkens' FCS line of credit never exceeded the $5.25 million limit. In reality, enormous overdrafts

were being created because virtually none of the checks written by SGLE or the Morkens was collectible.

Unlike most financial institutions involved in check kiting schemes, Firstar had access at all times to information on both the Morken and SGLE accounts which could have alerted it to the nature of Morken's activities or, at the least, made it suspicious of the multitude of large transactions occurring between the same parties and accounts.[10] However, Firstar did not review its records and reports as carefully as it could have done. Firstar generated daily internal reports detailing the substantial, daily transactions between these accounts. Yet, in spite of this and the persistent, increasing balance of uncollected funds in the Morkens and SGLE's accounts, Firstar continued the Morkens and SGLE's banking privileges in violation of express bank policies.

On June 2, 1994, during a training exercise using the Morken and SGLE accounts as working examples, Monica Crotty, a Firstar employee, became suspicious of check kiting activity between the accounts. After reviewing the accounts' activity and a flurry of meetings, Firstar told John Morken that it would no longer honor checks drawn on his and SGLE's accounts. To prevent further exposure, Firstar transferred balances between the Morken and SGLE accounts to remove the appearance of good funds in the accounts in order to prevent these funds from being mistakenly paid out to honor outstanding checks drawn on the accounts. As a result, there was an uncollected funds balance of approximately $21 million with Firstar and $18 million with FCS.

Firstar also started filing documents in a furious attempt to perfect its security interest. It was at this late date that Firstar filed its security agreement as non-standard fi-

---

$50,000 check on his account at Bank B and deposits it into his account at Bank A. At the time of the deposit of that check, Bank A gives the check kiter immediate credit on his account there, and on the basis of that grant of credit pays the original $50,000 check when it is presented for collection." *Williams v. United States*, 458 U.S. 279, 281 at n. 1, 102 S.Ct. 3088, 3089–3090 at n. 1, 73 L.Ed.2d 767 (1982).

10. In a typical check kiting scheme, the check kiter writes checks off of accounts located at different institutions, thereby avoiding detection as neither institution has access to the other's account information. Here, two of the three accounts involved in the check kiting scheme were located at Firstar.

nancing statements with the Iowa and Nebraska Secretaries of State and the county clerk's office in several Iowa and Nebraska counties. In the aftermath, Miley, Buscemi and Harry Hatton, a concurrence officer for the Morken/SGLE facility, lost their jobs. Roberto Vinent, Buscemi's immediate supervisor, was reassigned to new duties. On June 9, 1994, Firstar charged off the Morken and SGLE losses as "processing losses".

While the Morkens and SGLE engaged in the offsetting deposit transactions, they took the extra funds created from these transactions and continued to purchase cattle.[11] The disputed cattle grew rapidly from about 5,000 head in January 1994, to 24,324 on June 10, 1994, the date of the filing of the bankruptcy petitions. These 24,324 head of feeder cattle were located in the following feedlots in Iowa, Nebraska, and Minnesota:

| | |
|---|---|
| Brenton Brothers, Dallas County, Iowa | 1,633 head |
| Busse, Linn County, Iowa | 90 head |
| Eason, Greene County, Iowa | 1,561 head |
| Easton, Sioux County, Iowa | 132 head |
| Farmers Coop, Sioux County, Iowa | 349 head |
| Floyd, Sioux County, Iowa | 466 head |
| Hansen, Plymouth County, Iowa | 223 head |
| Hunt, Warren County, Iowa | 570 head |
| Oak Ridge, Dickinson County, Iowa | 846 head |
| Schomers Brothers, Shelby County, Iowa | 138 head |
| Schut, Sioux County, Iowa | 250 head |
| Valley View, Sioux County, Iowa | 207 head |
| Westview, Jasper County, Iowa | 1,192 head |
| West Central Cattle, Ida County, Iowa | 635 head |
| Bracht, Cuming County, Nebraska | 68 head |
| Dixon County, Dixon County, Nebraska | 433 head |
| LB, Antelope County, Nebraska | 11,745 head |
| Oshkosh, Garden County, Nebraska | 113 head |
| Ruser Venice, Douglas County, Nebraska | 2,846 head |
| Whispering Pines, Houston County, Minnesota [12] | 827 head |

## II. PROCEDURAL HISTORY

On June 10, 1994, the Morkens filed a petition under Chapter 11 and SGLE filed a petition under Chapter 7. On the same day, I ordered the appointment of a trustee and the United States Trustee appointed Kunkel trustee in the Morkens' chapter 11 case. The United States Trustee also appointed Ries trustee in the SGLE case. The Morken case was converted to a case under Chapter 7 on February 22, 1995, and Kunkel was reappointed trustee.

On the petition date, both Morken and SGLE claimed an interest in 24,324 head of feeder cattle. Sprague filed a proof of claim in the Morken case on October 21, 1994,

asserting a secured claim in the amount of $1,902,229.67. On March 1, 1995, Sprague assigned its claim to Firstar. On October 24, 1994, Firstar filed proofs of claims in both cases asserting secured claims in the amount of $23,171,549.06. On October 24, 1994, FCS filed proofs of claims in both cases asserting a partially secured claim in the Morken case and an unsecured claim in the SGLE case in the amount of $18,048,954.14.

On November 14, 1994, Kunkel filed this declaratory judgment action pursuant to 11 U.S.C. §§ 506(a), 541, 544, 547, 550 and 551 to determine the ownership of the cattle and $12,536,545.19 plus accruing interest in net proceeds from the sale of the cattle.[13] Kunk-

---

11. In addition to check kiting, Morken and SGLE also "kited" cattle by creating phony invoices to give the appearance that the cattle were being sold between Morken and SGLE. In reality, these invoices were created to justify the checks they wrote as part of their check kiting scheme.

12. The Whispering Pines feedlot was owned and operated by John Morken.

13. The cattle were liquidated pursuant to the terms of a stipulation I approved on July 25, 1995, and the proceeds, less liquidation expenses, are being held by Kunkel pending the outcome of this proceeding. At the time of trial, the proceeds with accrued interest was approximately $13,270,000.

el filed an amended complaint on July 14, 1995, adding Willberg Cattle Company as a defendant.

### A. Kunkel's Claims

Kunkel asserts an ownership interest in the cattle except for those cattle which were sold to SGLE by Morken through appropriately documented transactions and cattle which were purchased by Morken after June 2, 1994, and for which Morken did not tender payment. In his complaint, Kunkel asks me to:

1. Determine the ownership of the cattle on the petition date;

2. Determine Firstar's interest in the cattle;

3. Avoid FCS' security interest in cattle located at Oshkosh Feedyard, Nebraska;

4. Avoid Sprague's security interest in cattle located in Nebraska; and

5. Determine the validity, extent and priority of liens on the cattle.

### B. Ries' Claims

Ries counterclaimed against Kunkel, arguing that SGLE was the owner of the cattle and that any transfers of the cattle from SGLE to Morken are avoidable fraudulent transfers pursuant to 11 U.S.C. § 548.[14] Ries crossclaimed against FCS, Security State Bank of Sheldon and Sprague, asserting that they do not have perfected security interests and that any transfers of cattle by SGLE to Morken are avoidable fraudulent transfers under 11 U.S.C. § 548. Ries also crossclaimed against Firstar and Sprague, alleging that their security interests in cattle located in Iowa and Nebraska are avoidable preferential transfers under 11 U.S.C. § 547 or that, alternatively, the perfection filings in Nebraska are ineffective. Ries also asserted as an alternative theory that the cattle proceeds are subject to a constructive trust in favor of SGLE and Morken. In his Second Amended Answer, Counterclaim and Crossclaim, Ries asks me to:

1. Determine that the cattle are the property of the SGLE estate;

2. Avoid any transfers of cattle from SGLE to Morken within one year of the petition date as fraudulent transfers under 11 U.S.C. § 548 and determine that they are recoverable by Ries pursuant to 11 U.S.C. § 550;

3. Limit Firstar's security interests to cattle physically located in Minnesota on the petition date and in the amount of any obligation owed by SGLE;

4. Limit Sprague's security interests to cattle physically located in Minnesota on the petition date and in the amount of any obligation owed by Morken;

5. Determine that the cattle proceeds are the property of the SGLE estate free and clear of all liens and claims and should be paid accordingly, except as otherwise set out; and

6. Determine that, in the alternative, the proceeds are subject to a constructive trust for the benefit of Morken and SGLE in the amounts expended by them for the purchase of the cattle.

### C. Sprague's Claims

Sprague counterclaimed against Kunkel, alleging a perfected security interest in the cattle notwithstanding any transfer or removal of the cattle. Sprague crossclaimed against Ries, FCS, Sheldon and Firstar, asserting a superior, perfected security interest in the cattle. In its Second Amended Answer, Counterclaim and Crossclaim, Sprague asks me to:

1. Determine the validity, priority and extent of the interests asserted in the cattle and the proceeds; and

2. Order Kunkel to pay over to Sprague the proceeds it is entitled to.

### D. Firstar's Claims

Firstar counterclaimed against Kunkel and crossclaimed against all of the other defen-

---

**14.** In his post trial brief, Ries claimed only cattle in Groups 1, 2, and 4. Group 1 is comprised of cattle that were sold to SGLE by Morken between May 20 and June 2, 1994; Group 2 is comprised of cattle that Morken attempted to purchase from SGLE knowing that he could not pay for them; and Group 4 is comprised of cattle that were never transferred to Morken.

dants. Firstar's counterclaim and cross-claims assert a superior, perfected security interest in all of the cattle. Alternatively, Firstar claims that most of the cattle were purchased with funds fraudulently obtained by Morken from Firstar and are therefore subject to a constructive trust for Firstar's benefit. Firstar also asserts that FCS has no lien or other interest in the cattle and that the cattle is property of the bankruptcy estate of SGLE and should be distributed to creditors in order of their priority. Firstar also argues that, because it cannot be determined which estate owns any of the cattle, the Morken and SGLE estates should be substantively consolidated and the cattle proceeds distributed as a collective asset. Firstar's Second Amended Answer, Counterclaim and Crossclaim asks me to:

1.  Determine that Firstar has a first priority security interest in the cattle proceeds that is superior to any other lien or interest in the proceeds; or, alternatively,

2.  Impose a constructive trust for the benefit of Firstar; and

3.  Determine that FCS has no lien or interest in the proceeds and that the proceeds are the property of the SGLE estate; or

4.  Substantially consolidate the Morken and the SGLE estates and distribute the proceeds as a collective asset.

### E. FCS' Claims

FCS counterclaimed against Kunkel and cross-claimed against Sprague, Security State Bank of Sheldon, Willberg and Firstar, asserting a superior, perfected security interest in all cattle owned by Morken on the date of the petition.[15] In its Second Amended Answer, Counterclaim and Crossclaim, FCS asks me to:

1.  Determine that the cattle and the proceeds are property of FCS free and clear of any other claims or liens and should be paid over to FCS accordingly;

2.  Determine that Morken purchased the cattle in the ordinary course of business;

3.  Limit Firstar's security interest to cattle owned by SGLE and located in Minnesota on the date of the petition and in the amount of the obligation owed to it by SGLE.

4.  Limit Sprague's security interest to cattle owned by Morken and located in Minnesota on the date of the petition and in the amount of the obligation owed to it by Morken.

5.  Limit Sheldon's security interest to cattle owned by Morken and located in Iowa on the date of the petition and in the amount of the obligation owed to it by Morken.

6.  Limit Willberg's security interest to cattle owned by Willberg and located in Iowa on the date of the petition and in the amount of the obligation owed to it by Morken.

### F. Feedlots' Claims

The other defendants are feedlots located in Iowa and Nebraska. Each of the Iowa feedlots asserted statutory liens based upon Iowa Code § 579.1 on the cattle located in their respective feedlots on the petition date. Likewise, each of the Nebraska feedlots asserted statutory liens based upon Nebraska Statutes § 54–201(2).

On March 14, 1995, I entered default judgment against Busse Feedlot, Inc., Jeff Anema d/b/a Floyd Feedlot, Richard Hansen d/b/a Hansen Feed Yards, Oshkosh Feed Yard, Inc., Wayne Schut d/b/a Schut Feedlot, and Valley View Feedlots, Inc.

On April 17, 1995, I approved settlement agreements with Dixon County Feedyard Co., Bracht Feedyards, Inc., West Central Cattle Co., Ruser Venice Feedlots, Inc., James Easton d/b/a Easton Feedlots, Brenton Brothers, Inc., Westview of Monroe, Inc., Oak Ridge Feedlot, Inc., Farmers Co-op Society, Larryann Hunt, Inc., Robert Eason d/b/a Eason Feedlots, and Schomers Brothers, Inc., and, on May 15, 1995, dismissed

---

**15.** FCS' crossclaim against Firstar and Sprague is limited to cattle located in Iowa and Nebraska.

with prejudice the trustees' claims against them.

On October 4, 1995, I granted L/B Feedlot's motion for summary judgment, holding that L/B Feedlot was an over-secured creditor and entitled to be paid $25,549.70 together with interest and dismissed with prejudice Kunkel's claims against it.

On December 1, 1995, I granted FCS' motion to amend its answer to include the affirmative defenses of res judicata, collateral estoppel, and law of the case and granted Firstar and Ries' motion for summary judgment dismissing these defenses.

On January 18, 1996, I granted summary judgment on Kunkel's claims against Sheldon, holding that Sheldon has no interest in the cattle.

On January 22, 1996, I approved a stipulation between Kunkel and Sprague and granted partial summary judgment avoiding Sprague's financing statements filed in Nebraska as preferences except to the extent relied upon by Sprague to establish perfection of security interests in collateral removed to Nebraska from another jurisdiction in which Sprague held an unavoidable security interest.

On that same date, I also dismissed without prejudice Count Four of Firstar's Second Amended Answer, Counterclaim and Cross-claim requesting substantive consolidation of the Morken and SGLE bankruptcy estates.

On August 7, 1996, I approved a settlement among Willberg, Kunkel, Ries, FCS, Firstar and Sprague regarding Hunt Lot 5 to pay Willberg $33,996.59 of the net proceeds. On August 19, 1996, I dismissed all claims against Willberg.

#### G. Parties Remaining

The only remaining parties asserting an interest in the proceeds of the cattle are Kunkel, Ries, Firstar, Sprague,[16] and Farm Credit Services.

16. Technically, Sprague no longer has a claim because it assigned it to Firstar. However, for

### III. CHRONOLOGICAL SUMMARY

The following is a list of the various filings on which the lenders make their claims to the cattle and their proceeds:

*December 29, 1986*

Sprague files a financing statement in which the Morkens are the debtors in the Office of the Secretary of State, State of Iowa.

*November 14, 1988*

Sprague files a financing statement in which the Morkens are the debtors in the Office of the Houston County Recorder, Houston County, Minnesota.

*November 16, 1988*

Sprague files a financing statement in which the Morkens are the debtors in the Office of the Secretary of State, State of Minnesota.

*December 14, 1990*

Sprague files a financing statement in which the Morkens are the debtors in the Office of the County Recorder, Houston County, Minnesota.

*August 9, 1991*

The Morkens grant Sprague a security interest in all inventory, equipment, farm products, accounts and general intangibles owned by them.

*November 7, 1991*

Sprague files a continuation statement in which the Morkens are the debtors in the Office of the Secretary of State, State of Iowa.

*December 18, 1991*

The Morkens execute two promissory notes with FCS in the amounts of $189,945 and $671,668.

*January 28, 1992*

Firstar and SGLE execute a Wholesale Lockbox Agreement and a Control Disbursement Agreement.

*March 17, 1992*

Firstar and SGLE execute a Funds Transfer Agreement.

the sake of clarity, I will discuss Sprague's assigned claim separately from Firstar's.

*April 27, 1992*

Firstar and SGLE execute an On–Line Bankers Services Agreement.

*June 3, 1992*

The Morkens execute a Continuing Guaranty for the benefit of Firstar related to SGLE debt owed to Firstar.

Firstar and SGLE execute a General Business Security Agreement and a General Farm Security Agreement.

Firstar files a financing statement in which SGLE is the debtor in the Office of the Houston County Recorder, Houston County, Minnesota.

Firstar (as First Wisconsin) and SGLE execute a Demand Line of Credit Agreement and Note for $1.5 million.

*June 4, 1992*

Firstar files a financing statement in which SGLE is the debtor in the Office of the Secretary of State, State of Minnesota.

*June 30, 1992*

The Morkens maintain a joint checking account at Firstar Milwaukee.

*October 23, 1992*

The Morkens grant FCS a security interest in all livestock, proceeds from livestock, accounts and general intangibles owned by them.

Sprague executes a subordination agreement which subordinates its security interest in cattle located in Iowa and cattle financed by FCS in favor of FCS.

*October 26, 1992*

FCS files a financing statement in which the Morkens are the debtors in the Office of the Houston County Recorder, Houston County, Minnesota.

*October 27, 1992*

FCS files financing statements in which the Morkens are the debtors in the Office of the Secretary of State in Minnesota, Iowa and Nebraska, and in the Office of the County Clerk, Cuming County, Nebraska.

*November 5, 1992*

FCS files a financing statement in which the Morkens are the debtors in the Office

of the County Clerk, Cuming County, Nebraska.

*February 28, 1993*

Sprague and the Morkens execute a note in the amount of $316,149.50.

*March 24, 1993*

FCS files a financing statement in which the Morkens are the debtors in the Office of the County Clerk, Cuming County, Nebraska.

*March 25, 1993*

FCS files a financing statement in which the Morkens are the debtors in the Office of the County Clerk, Douglas County, Nebraska.

*May 3, 1993*

Firstar and SGLE execute a Demand Line of Credit Note in the amount of $1,500,000.

The Morkens execute a Reaffirmation of Guarantee in favor of Firstar related to SGLE debt.

*May 12, 1993*

FCS files financing statements in which the Morkens are the debtors in the Office of the County Clerk, Antelope County, Nebraska, and Cuming County, Nebraska.

*May 27, 1993*

Firstar and SGLE execute a Demand Line of Credit Agreement for a $1.5 million line of credit.

*August 19, 1993*

FCS files financing statements in which the Morkens are the debtors in the Office of the County Clerk, Antelope County, Nebraska, and Dixon County, Nebraska.

*August 20, 1993*

FCS files a financing statement in which the Morkens are the debtors in the Office of the County Clerk, Douglas County, Nebraska.

*August 26, 1993*

FCS files financing statements in which the Morkens are the debtors in the Office of the County Clerk, Cuming County, Nebraska, and Dixon County, Nebraska.

*October 15, 1993*

Sprague files a continuation statement in which the Morkens are the debtors in the

Office of the Houston County Recorder, Houston County, Minnesota.

*October 25, 1993*

Sprague files a continuation statement in which the Morkens are the debtors in the Office of the Secretary of State, State of Minnesota.

*November 18, 1993*

The Morkens execute a promissory note with FCS in the amount of $5,250,000.

*February 9, 1994*

The Morkens execute a promissory note with FCS in the amount of $315,000.

*May 31, 1994*

Sprague and the Morkens execute a revolving credit note in the amount of $1,650,000.

*June 8, 1994*

Sprague files security agreements in which the Morkens are the debtors as non-standard financing statements in the Office of the County Clerk, Antelope County, Nebraska, and Garden County, Nebraska.

Firstar files security agreements in which SGLE is the debtor as non-standard financing statements in the Office of the County Clerk, Antelope County, Nebraska; Garden County, Nebraska; Dixon County, Nebraska; and Cuming County, Nebraska.

*June 9, 1994*

Sprague files a continuation statement in which the Morkens are the debtors in the Office of the Secretary of State, State of Iowa.

Sprague files security agreements in which the Morkens are the debtors as non-standard financing statements in the Office of the County Clerk, Cuming County, Nebraska, and Dixon County, Nebraska.

Firstar files security agreements in which SGLE is the debtor as non-standard financing statements in the Office of the Secretary of State, State of Iowa and State of Nebraska.

Firstar files security agreements in which SGLE is the debtor as non-standard financing statements in the Offices of the County Clerk, Phelps County and Cuming County, Nebraska.

## IV.  DISCUSSION

### A.  Kunkel Owned All of the Cattle Except For 3146 Head He Concedes Are Owned by Ries and 63 Head Located in LB Feedlot 347 Which Are Also Owned by Ries.

Kunkel asserts ownership to all the cattle except for 3146 head[17] he concedes are

17.  These cattle are from lots sold to SGLE by Morken prior to the bankruptcy filing and lots Morken attempted to purchase but did not issue any drafts for.

Group 1, representing 2,722 head of cattle sold to SGLE by Morken, includes:

| | | |
|---|---|---|
| Brenton Lot 529 | 135 head | $ 72,293.15 |
| Eason Lot 5 | 263 head | $ 151,652.89 |
| Eason Lot 6 | 296 head | $ 162,525.32 |
| Eason Lot 7 | 183 head | $ 94,456.32 |
| Eason Lot 8 | 150 head | $ 67,851.20 |
| Farmers Co-op Lot 4802 | 185 head | $ 108,537.69 |
| Floyd Lot 2001 | 241 head | $ 124,465.00 |
| Floyd Lot 2002 | 225 head | $ 117,142.56 |
| LB Lot 341 | 212 head | $ 120,547.09 |
| LB Lot 342 | 183 head | $ 91,994.82 |
| LB Lot 343 | 200 head | $ 114,013.72 |
| Oshkosh Lot 230 | 113 head | $ 78,439.06 |
| Schut Lot 199 | 155 head | $ 64,139.32 |
| Valley View Lot 130 | 181 head | $ 98,866.26 |
| | | |
| TOTAL | 2722 head | $1,466,924.40 |

Group 3, representing 424 head of cattle, includes:

| | | |
|---|---|---|
| LB Lot 351 | 44 head | $ 23,253.94 |

owned by Ries. Ries concedes, and the evidence shows, Kunkel's ownership as asserted except for 63 head located in LB Feedlot 347 and representing $39,671.95 of the net proceeds. Ries contends that the 63 head were purchased by SGLE and were not subsequently sold to Morken.

At trial, Ries produced invoices demonstrating SGLE's ownership of the 63 head of cattle. Kunkel failed to prove Morken ever purchased these 63 head of cattle. Thus, SGLE was the owner of the 63 head of cattle at the time of the filing of the bankruptcy petition. Kunkel, therefore, has an ownership interest in all of the cattle except for the 3146 head of cattle he concedes are owned by Ries and the 63 head of cattle located in LB Feedlot 347. In terms of proceeds, this amounts to $10,815,644.93 plus accrued interest for Kunkel and $1,720,900.26 plus accrued interest for Ries.

### B. FCS Has a First Priority Security Interest in Morken Cattle Located in Nebraska and Iowa. Sprague Has a First Priority Security Interest in Morken Cattle Located in Minnesota.

Uniform Commercial Code [18] § 9-303(1) states that "[a] security interest is perfected when it has attached and when all of the applicable steps required for perfection have been taken." U.C.C. § 9-303(1) (1995).[19] In this case, as in most cases, filing a financing statement in the appropriate office is the step necessary to perfect a security interest. U.C.C. § 9-302 (1995).[20]

Section 9-312 of the U.C.C. determines priority among perfected creditors. This provision adopts the general principle that the "first to file is the first in right." U.C.C. § 9-312 (1995).[21] In other words, the first creditor to file a financing statement has priority over all other creditors secured by the same collateral.

Sprague and FCS both assert a first priority security interest in the same cattle located in Iowa and Minnesota. Sprague perfected its security interest by filing financing statements with the Iowa and Minnesota Secretaries of State's offices on December 29, 1986, and November 16, 1988, respectively, and with the Houston County Recorder's office on November 14, 1988. Sprague also filed security agreements as non-standard financing statements in various counties in Nebraska on the eve of the bankruptcy filing. The Nebraska filings were avoided as preferences on January 22, 1996. As a result, Sprague does not have a perfected security interest in any cattle located in Nebraska.

Section 9-316 of the U.C.C. provides that Article 9 does not prevent a priority creditor from subordinating its priority status in favor of another creditor.[22] On October 23, 1992, Sprague subordinated its security interest in cattle located in Iowa and in all cattle financed by FCS in favor of FCS's security interest. Thus, Sprague holds a first priority security interest only in Morken cattle that

| | | |
|---|---|---|
| LB Lot 352 | 32 head | $ 19,825.07 |
| LB Lot 354 | 68 head | $ 36,777.31 |
| Ruser Lot 5003 | 52 head | $ 25,210.69 |
| Ruser Lot 5005 | 115 head | $ 48,608.28 |
| Ruser Lot 5006 | 53 head | $ 25,704.58 |
| Schut Lot 201 | 60 head | $ 34,924.04 |
| TOTAL | 424 head | $ 214,303.91 |

18. The provisions of the Uniform Commercial Code have been adopted in Minnesota, Nebraska and Iowa. This opinion will refer to the U.C.C. provisions and footnote the appropriate state statute.

19. *See* Minn.Stat. § 336.9-303; Neb.Rev.Stat. § 9-303 and Iowa Code § 554.9303.

20. *See* Minn.Stat. § 336.9-302; Neb.Rev.Stat. § 9-303; and Iowa Code § 554.9303.

21. *See* Minn.Stat. § 336.9-312; Neb.Rev.Stat. § 9-312; and Iowa Code § 554.9312.

22. *See* Minn.Stat. § 336.9-316; Neb.Rev.Stat. § 9-316; and Iowa Code § 554.9316.

were located in Minnesota and not financed by FCS.

After Sprague executed the subordination agreement, FCS perfected its security interest by filing financing statements with the Minnesota, Nebraska and Iowa Secretaries of State's offices and the Houston County Recorder's office and Douglas, Antelope, Cummings and Dixon County Recorders' offices in Nebraska.[23]

As a result, FCS has a first priority security interest in all Morken cattle located in Iowa and Nebraska and any cattle located in Minnesota that were financed by FCS. Sprague has a second priority security interest in all Morken cattle located in Iowa and any Morken cattle located in Minnesota that were financed by FCS,[24] and a first priority security interest in any Morken cattle located in Minnesota that were not financed by FCS.

### 1. The Subordination Agreement Is Enforceable

■ Sprague attempts to avoid the effect of the subordination agreement. It contends that the subordination agreement terminated or alternatively, that it was limited to $1.5 million of the cattle.

Sprague argues that the subordination agreement terminated for two reasons. First, Sprague contends that the subordination agreement was with Farm Credit Services of Southeast Minnesota, ACA, not FCS. Farm Credit Services of Southeast Minnesota, ACA, merged with FCS on July 1, 1993. Sprague claims that, as a result of the merger, the entity to which it subordinated its security interest no longer exists and FCS cannot take advantage of the subordination agreement.

Chapter 23 of Title 12 of the United States Code defines the Farm Credit Association system and establishes the guidelines under which it operates. Pursuant to 12 U.S.C. § 2279c–1, a merged farm credit association shall "possess all powers granted under this chapter to the associations forming the merged association; and be subject to all of the obligations imposed under this chapter

on the associations forming the merged association." 12 U.S.C. § 2279c–1(b)(1)(A) and (B). Furthermore, even though the subordination agreement does not specifically refer to FCS, it is enforceable as "[e]quity dictates that where a contract has been in existence for [several years], where the subordination clause has been used and relied upon by the parties ... and where large sums have been lent in good faith", it should not be voided. *Republic Nat'l Life Ins. Co. v. Lorraine Realty Corp., et al.*, 279 N.W.2d 349, 353–354 (Minn.1979). Thus, FCS stands in the place of Farm Credit Services of Southeast Minnesota and is now the beneficiary of the subordination agreement executed by Sprague.

■ Second, Sprague argues that the subordination agreement terminated when FCS "paid off the indebtedness covered by the subordination agreement." This statement mischaracterizes the facts and the loan relationship between the Morkens and Farm Credit Services of Southeast Minnesota and FCS. When FCS zeroed out the original balance in the account the Morkens had with Farm Credit Services of Southeast Minnesota, it transferred the debt from the Farm Credit Services of Southeast Minnesota account into a newly created $5.25 million revolving line of credit with FCS which replaced the Farm Credit Services of Southeast Minnesota loan. By so doing, FCS refinanced Morken's indebtedness; it did not satisfy it. Furthermore, the new revolving line of credit was created to provide Morken with financing necessary to the operation expenses of running his cattle business and is exactly the type of future indebtedness that the subordination agreement was designed to accommodate. Sprague cannot now at this late date disavow the validity of the subordination agreement.

■ Sprague also contends that the subordination agreement is limited to $1.5 million of FCS' debt. However, the subordination agreement is not limited in any way, either expressly or impliedly, to a particular dollar amount. Rather, it anticipates and expressly

---

**23.** Neither FCS nor Sprague filed financing statements in Garden County, Nebraska.

**24.** Because FCS is undersecured, a second priority security interest is admittedly of no benefit to Sprague.

includes future operating indebtedness by Morken to FCS in its terms.

Thus, FCS has a first priority security interest and Sprague has a second priority security interest in Morken cattle located in Iowa. FCS has a first priority security interest in Morken cattle located in Nebraska.[25] As for cattle located in Minnesota, FCS presented no clear evidence demonstrating that any of the cattle located in Minnesota were financed by FCS funds. Thus, Sprague holds a first priority security interest and FCS holds a second priority security interest in any Morken Cattle located in Minnesota. In terms of proceeds, this amounts to $170,207.75 plus accrued interest for Sprague and $10,611,440.65 plus accrued interest for FCS.[26]

## V. Firstar Has a First Priority Security Interest in SGLE Cattle Located in Minnesota but Is an Unperfected Creditor in Nebraska and Iowa

■ Firstar claims that it has a perfected security interest in all of SGLE's inventory and farm products, including the cattle and the proceeds from their sale. Firstar states that, because it filed a financing statement in Minnesota before any other creditor of SGLE, it enjoys first priority in SGLE's cattle. This assertion is only partially correct. Firstar's filing of a financing statement in Minnesota before other creditors gives it first priority in SGLE's property located in Minnesota. With respect to cattle located in Iowa and Nebraska, however, Firstar is unperfected.

### A. Firstar Is a First Priority Secured Creditor of SGLE in Minnesota.

■ In order to perfect a security interest, a secured party must meet the requirements

of attachment and perfection. U.C.C. § 9–303.[27] Attachment, detailed in § 9–203, has 3 requirements:

1. there must be a valid security agreement;

2. the secured party must give value; and

3. the debtor must have rights in the collateral.

U.C.C. § 9–203.[28] Security interests in both inventory and farm products are perfected when the secured party files in the appropriate office. U.C.C. § 9–302.[29] SGLE executed a General Business Security Agreement and a Farm Security Agreement in Firstar's favor to secure a line of credit to finance its cattle purchases. When SGLE used funds from Firstar to purchase cattle, attachment occurred. Firstar filed the appropriate financing statement with the Houston County Recorder's office on June 3, 1992, and with the Minnesota Secretary of State's office on June 4, 1992. These filings gave Firstar a first priority security interest in SGLE cattle located in Minnesota.

At the time of the bankruptcy filings, only 827 head of the disputed cattle were located in feedlots in Minnesota while the rest were located in feedlots in either Iowa or Nebraska. However, Morken owned these 827 head, not SGLE. Thus, even though Firstar has a perfected security interest in SGLE cattle located in Minnesota, there were no SGLE cattle to which Firstar's security interest could attach.

■ Firstar argues that its security interest in SGLE cattle survived Morken's subsequent purchase and that the 827 head of cattle are subject to its security interest.

---

**25.** FCS did not file a financing statement in Garden County. However, the cattle located in the Oshkosh Feedlot are part of the SGLE estate, not the Morken estate, and are therefore not subject to FCS' security interest in any event.

**26.** $170,207.75 represents the net proceeds from Morken cattle located in Minnesota. $10,611,-440.65 represents the remaining balance of the $10,815,644.99 of net proceeds to which the Morken estate is entitled after deducting $33,-996.59 paid to Willberg Cattle Company after trial.

**27.** Attachment and perfection are governed by § 9–203 and § 9–302 of the Uniform Commercial Code, both of which have been adopted in Minnesota, thus citations will be made directly to Article 9. *See* Minn.Stat. § 336.9–203 and § 336.9–302.

**28.** *See* Minn.Stat. § 336.9–302.

**29.** *See* Minn.Stat. § 336.9–302.

Firstar bases this assertion on the premise that the SGLE sales of cattle to Morken were unauthorized pursuant to § 9–306(2) and outside of the ordinary course of business pursuant to § 9–307. This argument, however, is moot. Firstar is competing with itself. I have already determined that Sprague holds a first priority security interest in Morken cattle located in Minnesota. As Sprague has assigned all of its rights related to its loan agreements with the Morkens to Firstar, Firstar holds this first priority security interest. Thus, Firstar will receive the benefit of holding a first priority security interest in all the cattle located in Minnesota regardless of whether the cattle is determined to be subject to Firstar's security interest.

## B. Firstar Is an Unperfected Creditor in Nebraska and Iowa.

Firstar also asserts a first priority security interest in cattle sorted in Minnesota and subsequently shipped to feedlots located in Nebraska and Iowa. However, Firstar's perfection of its security interests in Nebraska and Iowa on the eve of the bankruptcy filings are avoidable preferences. Furthermore, Firstar's security interest in cattle it knew would be located in Iowa or Nebraska was not perfected by the cattle's temporary location in Minnesota in order to be sorted. Thus, Firstar's security interest in SGLE cattle located in Nebraska and Iowa is unperfected.

## 1. Firstar's Filing in Minnesota Did Not Perfect Its Security Interest in Collateral Moved from Minnesota to Nebraska and Iowa.

Firstar asserts that the perfection of its security interest in Minnesota continued to protect it even after the cattle were moved into Nebraska and Iowa. However, Firstar is unperfected in Nebraska and Iowa for several reasons. First, pursuant to U.C.C. § 9–103(1)(c), Firstar was a purchase money lender and should have filed in the state where it knew the collateral would be kept. Second, under U.C.C. § 9–103(1)(b), Firstar fails to meet the burden of the "last event test" as the last event here was Firstar's failure to file in the state where the cattle

were to be located. Third, the four month rule, as defined under U.C.C. § 9–103(1)(d), does not apply to Firstar because Firstar knew that the cattle would be located in Nebraska and Iowa and should have filed there to perfect its security interest.

## a. Firstar Loses Under the General Rules of Perfection. Moreover, It Is a Purchase Money Lender and Should Have Filed Where It Knew the Collateral Would Be Kept.

A purchase money security interest is defined in U.C.C. § 9–107 as "[a] security interest taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used." U.C.C. § 9–107. A loan given to enable a debtor to purchase its general inventory is a purchase money security interest. *See Grand Motors, Inc. v. Ford Motor Co.,* 564 F.Supp. 34 (W.D.Mo.1982) (Ford Motor was deemed to have a purchase money security interest in all inventory and proceeds purchased by a dealership for which Ford had provided a line of credit).

Firstar contends that the line of credit it extended to SGLE was not a purchase money security interest as it was not intended for the purchase of any particular or identifiable collateral but rather functioned as a general operating loan. However, Firstar knew that, at least in part, the loan was being used to purchase cattle. This is clearly evidenced by the fact that Firstar routinely sent representatives to feedlots to check on the cattle as is customary for collateral of this nature. Furthermore, Firstar's line of credit was in fact used to purchase the cattle.

U.C.C. § 9–103(1)(c), which addresses perfection of purchase money security interests in multi-state state transactions, provides:

If the parties to a transaction creating a purchase money security interest in goods in one jurisdiction understand at the time that the security interest attaches that the goods *will be* kept in another jurisdiction, then the law of the other jurisdiction governs the perfection and the effect of perfection or non-perfection of the security interest from the time it attaches until 30 days after the debtor receives possession

of the goods and thereafter if the goods are taken to the other jurisdiction before the end of the 30–day period.

U.C.C. § 9–103(1)(c) (emphasis added). Since Firstar is a purchase money lender, § 9–103(1)(c) governs the perfection of its security interest so long as Firstar understood at the time the security interest attached that the collateral would be kept in another jurisdiction. U.C.C. § 9–103(1)(c). It is clear that Firstar knew at all times that, although the cattle were to be sorted in Minnesota, their ultimate destination was to be either Iowa or Nebraska. Under these circumstances, Firstar should have perfected its security interest in Iowa and Nebraska.[30] Because it failed to do so, Firstar's security interest in SGLE cattle located in Iowa and Nebraska is unperfected (or at least it was until Firstar filed in Iowa and Nebraska on the eve of bankruptcy).

**b. Even If Firstar Was Not a Purchase Money Lender, Its Security Interest in SGLE Cattle Located in Iowa and Nebraska Is Unperfected as, Pursuant to the Last Event Test, Firstar Should Have Filed in Nebraska and Iowa.**

■ Even if Firstar was not a purchase money lender, its security interest in cattle located in Iowa and Nebraska is unperfected pursuant to the "last event" test.

■ Perfection in multi-state transactions is governed by U.C.C. § 9–103.[31] The general rule regarding perfection in multi-state transactions, often referred to as the last event test, is found in § 9–103(1)(b) which states:

Except as otherwise provided in this subsection, perfection and the effect of perfection or non-perfection of a security interest in collateral are governed by the law of the jurisdiction where the collateral is when the last event occurs on which is based the assertion that the security interest is perfected or unperfected.

U.C.C. § 9–103(1)(b). Thus, § 9–103(1)(b) mandates that the law of the jurisdiction in which the collateral was located when the last perfecting event occurred determines whether a security interest is perfected. In other words, the last event test determines in which state a creditor must file to perfect its security interest in multi-state transactions.

■ The broad language of § 9–103(1)(b) affords courts some discretion when determining what constitutes the last event to reach results that "make sense to them based on the facts and issue in dispute." PETER F. COOGAN ET AL., SECURED TRANSACTIONS UNDER THE UNIFORM COMMERCIAL CODE ¶ 5.05[2][a] (1996). Using this flexibility, courts have ascribed the controlling last event to a variety of circumstances. *See First Nat'l Bank of Amarillo v. Southwestern Livestock, Inc.,* 616 F.Supp. 1515 (D.Kan. 1985) (last event was the failure to file in the state to which the goods were removed); *In re Slippery Rock Forging, Inc.,* 99 B.R. 679 (Bankr.W.D.Pa.1989) (last event was the manufacture of the collateral); and *In re Vermont Knitting Co., Inc.,* 98 B.R. 184 (Bankr.D.Vt.1989) (last event was the filing of a financing statement).

■ In reviewing the notes and commentary, it is clear, however, that in situations where the security interest is perfected in one jurisdiction and the collateral is removed to another, the failure to maintain perfection in the latter jurisdiction is the "last event" to which the rule refers. Official U.C.C. Comment 1. *See also First Nat'l Bank of Amarillo v. Southwestern Livestock, Inc.,* 616 F.Supp. at 1515. Here, Firstar's failure to perfect its security interest in Iowa and Nebraska, the states to which the cattle were removed, was the last event. Thus, as Firstar did not comply with the filing requirements pursuant to Iowa and Nebraska law,[32] Firstar is unperfected in these states.

---

**30.** Had Firstar properly perfected its purchase money security interest in Nebraska or Iowa, it would have been secured in any cattle destined for those states while the cattle were being sorted in Minnesota.

**31.** *See* Minn.Stat. § 336.9–103; Iowa Code § 554.9103; and Neb.Rev.Stat. § 9–103.

**32.** Firstar did eventually file in Iowa and Nebraska but, as we will see, those filings created a preference and does not help Firstar.

Furthermore, Firstar knew that, although the cattle were temporarily transported to Minnesota for sorting, they were to be transported and located in either Iowa and Nebraska. The last event is not the filing in a state through which the collateral temporarily moves. Rather, it is the failure to file in the state where the goods are to remain permanently. Firstar's filing of a financing statement in Minnesota cannot be the last event as the cattle were never intended to remain in Minnesota.

### c. The Four Month Rule Does Not Apply to Firstar Because It Knew the Collateral Would Be Removed from Minnesota.

▮▮▮ Firstar, relying on U.C.C. § 9–103(1)(d), argues that the perfection of its security interest in cattle located in Minnesota extended to cattle moved through Minnesota to Nebraska and Iowa. Section 9–103(1)(d), otherwise known as the "four month rule", does not govern perfection in the first instance but rather deals with perfection in the destination state after collateral is removed from the original state of filing. U.C.C. § 9–103(1)(d) states:

> When collateral is brought into and kept in this state while subject to a security interest perfected under the law of the jurisdiction from which the collateral was removed, the security interest remains perfected, but if action is required by part 3 of this article to perfect the security interest,
>
> (I) If action is not taken before the expiration of the period of perfection in the other jurisdiction or the end of four months after the collateral is brought into this state, whichever period expires first, the security interest becomes unperfected as against a person who became a purchaser after removal.

U.C.C. § 9–103(1)(d). Thus, for § 9–103(1)(d) to apply, two requirements must be met: (1) the collateral must be "brought into and kept in this state", which in this case is Nebraska or Iowa; and (2) the collateral must be "subject to a security interest already perfected under the law of the jurisdiction from which the collateral was removed", in this case Minnesota. Once these requirements are met, the secured party has a four month grace period where it remains perfected after the collateral has been removed from the state in which it filed.

▮▮▮ However, not all creditors are eligible for protection under § 9–103(1)(d). When a secured party knows that the collateral will be moved to a state other than where it is perfected, the party may not claim protection under § 9–103(1)(d) but must rather refile in the state where the collateral will be located once the collateral is moved. *See Finance Co. of Am. v. Hans Mueller Corp. (In re Automated Bookbinding Services, Inc.)*, 471 F.2d 546 (4th Cir. 1972). Furthermore, a strict application of the four month rule will not be applied if it produces results "demonstratively at odds with the purpose of the provision." *C Tek Software, Inc., v. New York State Business Venture Partnership (In re C Tek Software, Inc.)*, 117 B.R. 762, 768–769 (Bankr.D.N.H. 1990). The purpose of the four month grace period is "to protect creditors from absconding debtors", not to allow secured parties a four month exemption from filing under all circumstances. *Finance Co. of Am. v. Hans Mueller Corp. (In re Automated Bookbinding Services, Inc.)*, 471 F.2d at 555. Comment 7 to § 9–103(1)(d) states that "the four month period is long enough for a secured party to discover in most cases that the collateral has been removed and refile in this state. . . ." Thus, § 9–103(1)(d) gives the creditor a grace period in which its interest remains perfected so that, in the event an absconding debtor sells the collateral in the new state, the buyer cannot take free of the creditor's security interest during the four month period. *Id.*

Firstar argues that the "knowledge exception" set forth in *Finance Co. of Am. v. Hans Mueller Corp. (In re Automated Bookbinding)* should be limited and cites to *Gennet v. Fason*, 178 B.R. 888, 894 (S.D.Fla.1995), for support. There, the court found that, unless the creditor actually participated in the transportation of the collateral, the four month rule should apply. I disagree with this analysis and application of § 9–103(1)(d). The comment outlining the policy to § 9–103(1)(d) clearly states that the four month

rule is meant to give creditors time to find the collateral and refile when the collateral has been moved to another state. In other words, the rule is meant to protect creditors from absconding debtors. It is clear that, unless these special circumstances exist, this provision does not apply. Neither the statute nor the comments speaks to an additional requirement of the creditor's participation in the removal of the collateral; only that the creditor knows that the collateral will be removed. This knowledge alone is enough to deprive a creditor of the protection afforded by the four month rule.

Furthermore, the circumstances in this case do not merit affording protection under § 9–103(1)(d). SGLE was not an absconding debtor. Moreover, Firstar is a very sophisticated creditor and knew at all times that the cattle would be kept in Minnesota for no more than 2–3 days, then transported and permanently located in Iowa or Nebraska. It is beyond the scope of both logic and the laws of perfection to determine perfection by the temporary passage of collateral through a state where that creditor was perfected rather than the state where the collateral is to be located.

▇▇▇ Firstar also argues that, because the sale of cattle to Morken by SGLE occurred in Minnesota, Morken was not a "purchaser after removal" as required by § 9–103(1)(d) but rather took the cattle subject to Firstar's security interest. This argument misses the point. The purchaser after removal concept, as contemplated by § 9–103(1)(d), is part of the priority scheme set forth in this provision and only becomes relevant once it is determined that § 9–103(1)(d) is applicable. As previously discussed, § 9–103(1)(d) does not apply at all. Therefore, the priority scheme set forth under this provision is irrelevant.

▇▇▇ Finally, even if Firstar was eligible to take advantage of the four month rule, one requirement of the rule is perfection in the state from where the cattle were removed, here Minnesota. As we saw earlier, filing in Minnesota did not perfect Firstar's security interest in those cattle shipped to Iowa and Nebraska.

## 2. Firstar's Security Interests in Nebraska and Iowa Are Avoidable.

▇▇▇ Although Firstar's perfected security interest in Minnesota does not extend to cattle located in Iowa and Nebraska, it's filing of security agreements as non-standard financing statements in Nebraska and Iowa on June 8 and 9, 1994, perfected its security interest in SGLE cattle in those states. However, these security interests are avoidable preferences pursuant to 11 U.S.C. § 547 (1994). In order to avoid a transfer as a preference, a trustee must prove the following elements:

(1) There must be a transfer of an interest of the debtor in property;

(2) On account of an antecedent debt;

(3) To or for the benefit of a creditor;

(4) Made while the debtor was insolvent;

(5) Within 90 days prior to the commencement of the bankruptcy case;

(6) That left the creditor better off than it would have been if the transfer had not been made and the creditor asserted its claim in a chapter 7 liquidation.

11 U.S.C. § 547(b). *See Buckley v. Jeld–Wen, Inc. (In re Interior Wood Products Co.)*, 986 F.2d 228, 230 (8th Cir.1993). Once the trustee meets this burden, the trustee may avoid the transfer and recover the property or value of the property for the benefit of the estate pursuant to 11 U.S.C. § 550. *Harstad v. First Am. Bank*, 39 F.3d 898, 903 (8th Cir.1994).

▇▇▇ Ries has demonstrated all the elements of a preference. The transfer of a security interest in a debtor's property is deemed to have occurred at the time the transfer is perfected if perfection occurs 10 days or more after the transfer. 11 U.S.C. § 547(e)(2)(B). Here, Firstar perfected its security interest in Iowa and Nebraska on June 8 and 9, 1994, more than two years after it received a security interest in SGLE cattle. Thus, the grant of the security interest which transferred SGLE's interest in the cattle to Firstar, its creditor, on account of a debt created earlier when SGLE purchased the cattle occurred on June 8 and 9, 1994, when Firstar perfected its security interest.

June 8 and 9, 1994, was two days before commencement of the case. There is no doubt that, if allowed, the filings would enhance Firstar's position and put it in a much better position than it would have been asserting an unsecured claim in a chapter 7 liquidation. Finally, pursuant to 11 U.S.C. § 547(f), SGLE is presumed insolvent during the 90 days immediately preceding the date of the bankruptcy petition. Firstar's security interest in cattle located in Iowa and Nebraska resulted from a preference and are avoidable by Ries.[33]

## VI. Imposition of a Constructive Trust for the Benefit of Firstar Is Inappropriate

■ Firstar requests that I impose a constructive trust on the proceeds of the sale of the disputed cattle. This is an inappropriate remedy given the facts of this case. Imposition of a constructive trust in Firstar's favor would give it preferential treatment over other creditors contrary to the Bankruptcy Code's system of distribution.

### A. Whether Firstar Meets State Law Requirements for a Constructive Trust Is Irrelevant in This Case.

■ Courts typically look to state law to determine whether a party has adequately demonstrated that a constructive trust should be imposed.[34] Southmark Corp. v. Grosz (In re Southmark Corp.), 49 F.3d 1111, 1118 (5th Cir.1995) (state law determines whether a party has adequately demonstrated that property is held in a constructive trust for another); Small v. Beverly Bank, 936 F.2d 945, 949 (7th Cir.1991) (imposition of an equitable lien in bankruptcy is good only if it would be sufficient under applicable state law); N.S. Garrott & Sons v. Union Planters Nat'l Bank (In re N.S. Garrott & Sons), 772 F.2d 462, 466 (8th Cir. 1985).[35] However, it is federal bankruptcy law that ultimately determines whether a constructive trust is appropriate in a bankruptcy case. "[W]hile state law must be the starting point in determining whether a constructive trust may arise in a federal bankruptcy case, that law must be applied in a manner not inconsistent with federal bankruptcy law." Mitsui Manufacturers Bank v. Unicom Computer Corp. (In re Unicom Computer Corp.), 13 F.3d 321, 325 n. 6 (9th Cir.1994). The unique considerations involved in a bankruptcy case must "drive the result on the constructive trust issue." Shields v. Duggan (In re Dartco, Inc.), 197 B.R. 860, 869 (Bankr.D.Minn.1996). Firstar is not entitled to a constructive trust as a matter of federal bankruptcy law. Thus, whether or not it meets the state law requirements is irrelevant.

### B. Imposition of a Post–Petition Constructive Trust Is Inappropriate When Its Effect Is To Give Firstar a Preference over Other Creditors.

Firstar claims the right to the imposition of a constructive trust should it be found that it does not have a perfected security interest in the proceeds of the disputed cattle. Thus, Firstar asserts this remedy as an unsecured creditor.

Courts are split over whether constructive trusts can be imposed in bankruptcy cases. Shubert v. Jeter (In re Jeter), 171 B.R. 1015, 1020 (W.D.Mo.1994), aff'd, 73 F.3d 205 (8th Cir.1996). Constructive trusts are inconsistent with the Bankruptcy Code's detailed

---

33. Sprague also filed similar financing statements on the eve of the bankruptcy filings. Sprague, however, stipulated to the avoidance of their filings.

34. Kunkel and Ries had also requested imposition of constructive trusts in their original pleadings but have apparently abandoned their requests.

35. Minnesota law, for example, has two requirements that must be met in order to impose a constructive trust. First, the case must involve fraud, taking improper advantage of a confiden-

tial or fiduciary relationship, or unjust enrichment. Monfort, Inc. v. Kunkel (In re Morken), 182 B.R. 1007, 1022 (Bankr.D.Minn.1995) citing Thompson v. Nesheim, 280 Minn. 407, 159 N.W.2d 910, 917 (1968). In addition to proof of wrongdoing, when a claimant seeks to impose a constructive trust upon property of a debtor in bankruptcy, the claimed beneficiary to the trust must be able to sufficiently trace the original property to the proceeds. Chiu v. Wong, 16 F.3d 306, 310 (8th Cir.1994) citing Rock v. Hennepin Broadcasting Associates, 359 N.W.2d 735, 739 (Minn.Ct.App.1984).

treatment of creditors. *Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d at 1118 ("We are mindful, therefore, that the imposition of a constructive trust is a potent remedy, as it gives the successful claimant priority over the debtor's unsecured creditors; thus the trust should not be imposed 'cavalierly' in a bankruptcy proceeding"); *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443, 1452 (6th Cir. 1994) (constructive trusts are "anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, not from the offending debtor"); *Shields v. Duggan (In re Dartco, Inc.)*, 197 B.R. at 869 ("The post-bankruptcy judicial imposition of 'equitable' liens and interests against estate assets takes the value thus attached away from other claimants against the estate, who otherwise were situated similarly to the beneficiaries of such adjudications"); *Monfort Inc. v. Kunkel, et al. (In re Morken)*, 182 B.R. at 1022 (imposition of a post-petition constructive trust prefers particular creditors over the rest of the estate's creditors).

Due to the conflict between constructive trusts and the Bankruptcy Code, some courts, including the Fourth and Sixth Circuits, have refused to impose constructive trusts post-petition. These courts hold that, unless a trust was either imposed upon the debtor's assets prior to the time of filing or some other statute requires such an imposition, a constructive trust may not be imposed post-petition. *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d at 1449 (6th Cir.1994); *Shirkey v. Leake*, 715 F.2d 859, 863 (4th Cir.1983).

The Eighth Circuit has not put a total ban on trusts imposed post-petition but rather allows them in very limited situations. The circumstances under which the Eighth Circuit has imposed post-petition trusts involved creditors who asserted ownership interests in exempt property not property of the estate. In *Chiu v. Wong*, 16 F.3d 306 (8th Cir.1994), the debtors misappropriated funds and invested the money in exempt homestead property in order to shield the funds from creditors. *Chiu v. Wong*, 16 F.3d 306 (8th Cir. 1994). There, the Eighth Circuit imposed a post-petition trust on the exempt homestead property, holding that a constructive trust was appropriate because the trust was imposed on the debtor's property and did not diminish the estate to the detriment of other creditors. *Id.*

■ The Eighth Circuit may also allow imposition of a post-petition trust to prevent a fraudulent debtor from being unjustly enriched. *See, e.g., Shubert v. Jeter (In re Jeter)*, 171 B.R. 1015 (W.D.Mo.1994), *aff'd*, 73 F.3d 205 (8th Cir.1996). In *Jeter*, the bankruptcy court found that the creditor's claim for a constructive trust was a disguised attempt to recover pre-petition fraudulent transfers. The Eighth Circuit affirmed the bankruptcy and district courts, holding that, as the debtor was not unjustly enriched by his fraud, the creditor was not entitled to any special rights. Furthermore, the Court noted that other creditors also had strong equitable claims on the remaining assets of the estate and to impose a trust would unfairly prefer one creditor. The Court compared the circumstances in *Jeter* to those in *Chiu v. Wong*, noting that the assets in *Chiu v. Wong* which were subject to a trust were not otherwise reachable by creditors and, were it not for the imposition of the trust, the debtors would have been unjustly enriched. The Court further reasoned that, unlike the remaining creditors in *Chiu v. Wong*, the other creditors in *Jeter* would have been prejudiced by the imposition of a trust favoring one particular creditor, suggesting perhaps that a trust should not be imposed at all if its imposition is detrimental to the estate. *Shubert v. Jeter*, 73 F.3d at 207 n. 2. Thus, in the Eighth Circuit, there are at least two requirements before a constructive trust can be imposed: the debtor's misconduct allows principles of equity to override legal considerations and the contest is between a creditor and the debtor, not among creditors.

Recently, in an analogous situation, the Supreme Court held in *U.S. v. Thomas R. Noland* that a "bankruptcy court may not equitably subordinate claims on a categorical basis in derogation of Congress's scheme of priorities." *U.S. v. Thomas R. Noland*, —— U.S. ——, ——, 116 S.Ct. 1524, 1525, 134 L.Ed.2d 748 (1996). The Court reasoned

that, although 11 U.S.C. § 510(c) adopts the principles of equitable subordination and permits courts to make exceptions to a general rule when the facts so justify, this provision is not intended to "empower a court to modify the operation of the priority statute at the same level at which Congress operated when it made its general judgment to establish the hierarchy of claims in the first place," as to do so would give the courts legislative power to revise statutes. *Id.* at ——, 116 S.Ct. at 1527. Rather, "[d]ecisions about the treatment of categories of claims in bankruptcy proceedings ... are not dictated or illuminated by principles of equity and do not fall within the judicial power of equitable subordination...." *Id., citing Burden v. U.S.*, 917 F.2d 115, 122 (3rd Cir.1990).

Similarly, constructive trusts cannot be used to alter the priority scheme explicitly prescribed by Congress. Thus, if a defrauded creditor claims a constructive trust to recover property of the debtor, there is no conflict with the rules governing priority among creditors. If, however, the creditor claims a constructive trust on property of the estate, there is a conflict with the Code's priority rules because one creditor would be preferred over the other creditors in contravention of the Bankruptcy Code's detailed distribution scheme.

Firstar is not entitled to a constructive trust. "Unless a court has already impressed a constructive trust upon certain assets ... the claimant cannot properly represent to the bankruptcy court that he was, at the time of the commencement of the case, a beneficiary of a constructive trust held by the debtor." [36] *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d at 1449. No court imposed a constructive trust before these cases were filed. Furthermore, the circumstances here do not rise to an egregious level warranting the undermining of the proscribed policy of pro rata distribution and to so do would result in Firstar unfairly benefiting at the expense of other similarly situated creditors. Moreover, by seeking a constructive trust, Firstar is attempting to recover through the back door what it cannot recover directly. *Shubert v. Jeter (In re Jeter)*, 171 B.R. at 1022. Also, the fact that Firstar's loss resulted from its own actions and failure to perfect its security interest mitigates against the imposition of a trust. *See Monfort Inc. v. Kunkel et al. (In re Morken)*, 182 B.R. at 1023.

## VII. CONCLUSION

Without considering interest, $1,720,900.20 is property of the SGLE estate. None of the other defendants have a security interest in these proceeds.

Also without considering interest and after deducting the $33,996.59 paid to Willberg Cattle Company, $10,781,648.40 is property of the Morken estate.[37] Of that, Firstar, by way of its assignment from Sprague, has a perfected security interest in $170,207.75 representing the proceeds from the cattle located at Whispering Pines and FCS has a perfected security interest in the rest, or $10,611,440.65, leaving nothing for Kunkel. Because it assigned its claim to Firstar, Sprague has no interest in the proceeds.

A number of other arguments raised by the parties are either moot as a result of my disposition of other issues or are rejected as meritless.

THEREFORE, IT IS ORDERED THAT:

1.  The security interest of defendant Firstar Bank Milwaukee, N.A., in cattle located in Iowa and Nebraska on June 10, 1994, is void.

2.  The plaintiff has no interest in the proceeds that are the subject of this proceeding.

3.  The plaintiff shall pay to defendant Charles W. Ries $1,720,900.20 together with accrued interest.

36. If a constructive trust is imposed by a court prior to bankruptcy, the property does not become property of the estate pursuant to § 541(a) and (d) and a bankruptcy court should honor that court-imposed trust.

37. This amount assumes that $25,549.79 plus applicable interest was paid to L/B Feedlot prior to trial pursuant to my order entered on October 4, 1995.

4. The plaintiff shall pay to defendant Firstar Bank Milwaukee, N.A., $170,207.75 together with accrued interest.

5. The plaintiff shall pay to defendant Farm Credit Services of Southern Minnesota, ACA, $10,611,440.65 together with accrued interest.

LET JUDGMENT BE ENTERED ACCORDINGLY.